**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
───────────────────────────────────────

**ABEL SABORIT, JR.,**

                    **Plaintiff,**                                        **Index No. 19-cv-4686**

                    **- against -**

                                                                         **COMPLAINT**

**HARLEM HOSPITAL CENTER**
**AUXILIARY, INC.,**
**NEW YORK CITY HEALTH AND**
**HOSPITALS CORPORATION, and**
**KEESHA NEDD,** *individually,*

                    **Defendants.**
───────────────────────────────────────

        Plaintiff, **ABEL SABORIT, JR.**, by his attorneys, Crumiller P.C., as and for his

Complaint, alleges as follows:

### Preliminary Statement

        1.        This action is brought to remedy Defendants' unlawful failure to accommodate

Plaintiff's disability, as well as discrimination and retaliation in the terms, conditions and

privileges of Plaintiff's employment on the basis of disability, in violation of the Americans with

Disabilities Act of 1990, § 2 *et seq*., 42 U.S.C.A. § 12101 *et seq*., as amended by § 504 of the

Rehabilitation Act of 1973 ("ADA"); the New York State Human Rights Law, N.Y. Exec. Law

§§ 290 *et seq*. (the "NYSHRL"); and the New York City Human Rights Law, N.Y.C.

Administrative Code § 8-107, as amended by the Local Civil Rights Restoration Act, N.Y.C.

Local Law No. 85 of 2005 (the "NYCHRL").

        2.        Plaintiff brings this action for injunctive and declaratory relief, compensatory and

punitive damages, and other appropriate equitable and legal relief.

**Jurisdiction and Venue**

3.      This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343, as well as supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in the Southern District of New York because the acts and omissions that form the basis of Plaintiff's claims occurred in the Southern District of New York.

5.      Plaintiff has served a copy of this Complaint on the Corporation Counsel's Office.

6.      Plaintiff has complied fully with all procedural prerequisites to filing his NYCHRL claims.

**The Parties**

7.      Plaintiff Abel Saborit, Jr. ("Plaintiff") is an individual over 18 years old who resided in the state of New York, County of New York, at all times relevant hereto.

8.      Defendant Harlem Hospital (the "Hospital") is a domestic non-profit corporation that receives federal funding as a Federally Qualified Health Center.  It is located in the County of New York, State of New York, with its principal place of business at 506 Lennox Avenue, New York, New York.

9.      Defendant New York City Health & Hospitals Corporation ("NYCHHC"), a domestic not-for-profit corporation, is the largest municipal healthcare organization in the country, and also receives federal funding as a Federally Qualified Health Center.  NYCHHC has its principal place of business in the County of New York, State of New York, at 125 Worth Street, New York, New York.

10.     Plaintiff was jointly employed by Harlem Hospital and NYCHHC.

11.     Defendant Keesha Nedd ("Nedd") is an individual over 18 years old who, upon information and belief, is domiciled in Yonkers, Westchester County, in the State of New York. At all times relevant, Need, as the Human Resources Director of NYCHHR, was Plaintiff's

manager and direct supervisor, with the power to hire and fire Plaintiff and his colleagues. Indeed, it was Nedd who hired Plaintiff and then subsequently terminated his employment.

## Statement of Facts

12.    Plaintiff is a Human Resources ("HR") professional living with Human Immunodeficiency Virus ("HIV").[1]

13.    Plaintiff has a Master's degree in Business Administration, a Master's degree in HR, and over 15 years of experience in HR and labor relations management.

14.    On or about November 5, 2018, Plaintiff was hired by Harlem Hospital and NYCHHC (collectively, "Corporate Defendants") in the position of Assistant Personnel Director at Harlem Hospital.

15.    Plaintiff's job duties in the position of Assistant Personnel Director included, but were not limited to, (a) managing the four-person compliance team regarding joint commission standards to ensure joint commission accreditation and healthcare provider licensure, and (b) managing the 11-person Human Resources ("HR") generalist team.

16.    At all times relevant, Plaintiff was fully qualified for the position of Assistant Personnel Director at Harlem Hospital, and entirely able to perform the essential functions of his job.

17.    Plaintiff worked hard in this position, staying later than required in the evenings and working at the office on certain weekends as well in order to catch up on the backlog of work that had accumulated prior to his hire.

18.    Plaintiff performed his job duties successfully and quickly developed positive professional relationships with Nedd, as well as his 15 direct reports.

19.    His relationship with Nedd continued without incident until Nedd learned that

---

[1] The phrase "HIV positive" is now considered to be unnecessarily stigmatizing and has therefore fallen out of favor with advocates, for whom "person living with HIV" (or "PLHIV") is now the preferred term. For further information, see, e.g., The Well Project, *https://www.thewellproject.org/hiv-information/why-language-matters-facing-hiv-stigma-our-own-words* (last accessed 5/14/19).

Plaintiff was living with HIV, at which point her attitude abruptly and dramatically changed.

Plaintiff's Request for Reasonable Accommodations

20.     On December 13, 2018, Plaintiff informed Nedd that he had a disability in that he is living with HIV, and requested the following reasonable accommodations necessitated by the side effects of his HIV medications:

- Permission to occasionally lie down in his office and/or put his head down on his desk in order to wait for the dizzying effect of his HIV medications to subside;

- Permission to change clothes as needed throughout the day, due to excessive perspiration caused by his HIV medications; and

- Easy and rapid access to a restroom due to digestive and stomach upset caused by his HIV medications.

21.     Plaintiff further requested that Nedd provide him with whatever paperwork was necessary in order to formalize his request for accommodation, in concert with his physician.

22.     Nedd replied she was not aware of any required documentation and stated that the request for accommodation need not be formalized, and declined Plaintiff's offer of a note from his physician.

23.     Following Plaintiff's disclosure that he is a person living with HIV, Nedd's attitude toward him shifted dramatically, and she began to treat him differently from, and more negatively than, other similarly situated employees who were not known to be living with HIV.

24.     Defendants thereafter began to discriminate and retaliate against Plaintiff in connection with his disability and his protected activity of requesting reasonable accommodation.

25.     Worse, Defendants' actions were specifically targeted to frustrate the conditions for which Plaintiff had requested accommodation: banning him from the restrooms, in response

to his disclosure that he needed frequent access thereto, and evicting him from his private office, in response to his disclosure that he occasionally needed short periods of privacy.

<u>Defendants Removed Plaintiff's Supervisory Responsibilities, Without Explanation</u>

26.     In early January, 2018, Nedd informed Plaintiff that the HR generalist employees would no longer be reporting to him, and would instead report directly to her. Nedd did not provide any explanation for this adverse change, which was effectively a demotion.

<u>Defendants Banned Plaintiff from the Staff Restrooms, Based on a Demonstrable Lie</u>

27.     On or about January 21, 2019, Nedd called Plaintiff into her office and falsely accused him of having left a shared HR employee restroom in a "filthy" and "disgusting" condition on Friday, January 18, 2019.

28.     However, Plaintiff had never left the restroom in a filthy or disgusting condition. As he explained to Nedd, he was not even working at the Harlem Hospital location that day; rather, he was downtown at the NYCHHC central office at 65 Water Street for a mandatory training.  Therefore, the culprit, if in fact there was one, could not have been him.

29.     Nedd ignored the incontrovertible proof and then used the purportedly-soiled restroom as a pretext to rescind Plaintiff's access to any of the staff restrooms on the sixth floor, where his office was located, barring Plaintiff from future use of any employee restroom on the sixth floor, so that those bathrooms would not become filthy or disgusting "again."

30.     Instead, Nedd directed Plaintiff to travel down to the fourth floor to use the public restroom there.  She also directed him to specifically inform his team that he was going to the fourth floor to use the restroom before each use.

31.     Having to tell his entire team about his restroom activity was extremely

humiliating for Plaintiff, especially in light of his frequent need to use the restroom as described above. Having to travel several floors to use the restroom also caused him physical discomfort on a day-to-day basis, and forced him to spend significant unnecessary time away from his desk.

32.     Indeed, Nedd's act in banning Plaintiff from the employee restrooms on his floor was a denial of his request for the entirely reasonable accommodation of frequent, unhindered restroom access, due to his disability. In violation of federal, state and city law, there was no "interactive process" or cooperative dialogue around this baseless and discriminatory denial of requested accommodations.

33.     As an HR Director, Nedd certainly should have known that she was violating Plaintiff's rights by banning him from the restrooms on his floor, especially as she knew that he required unhindered restroom access due to his disability, and had even requested such access as a reasonable accommodation.

34.     Moreover, by banning him from the employee restrooms on the floor where he worked, Nedd had placed Plaintiff in an even worse position than he had been in prior to his request for reasonable accommodations.

35.     Thus, Nedd did not simply deny Plaintiff's request for reasonable accommodation of easy and rapid access to a restroom – rather, she denied such request and also went further by proactively hindering his access to the restroom.

Defendants Removed Plaintiff from His Private Office

36.     During the same meeting on or about January 21, 2019, Nedd informed Plaintiff that she had decided to displace him from his private office, and instead seat him in an open cubicle area along with the compliance team.

37.     Nedd explained that Plaintiff needed to be closer to his team, but such explanation

made no sense as his office was already located within 50 feet of his team.  In contrast, the HR generalist employees that had previously reported to Plaintiff all had private offices.

38.     In addition to the adverse change of stripping him of his office, this decision specifically interfered with the reasonable accommodations he had requested by making it impossible for him to lie down in his office, as well as more difficult for him to put his head down on his desk, in that he no longer had any privacy.

Defendant Singled Plaintiff Out, Pretextually, for Bogus Purported Infractions

39.     Approximately two weeks later, in or about early February, 2019, Nedd harshly reprimanded Plaintiff for making a personal phone call at work.

40.     Plaintiff explained to Nedd that he was speaking to his elderly mother, who was having a medical emergency, but Nedd nonetheless added this critique to a subsequent written performance review, as a pretext for Plaintiff's termination (see, *infra,* ¶67).

41.     Upon information and belief, Plaintiff's colleagues were not penalized in this way for making personal calls at work, especially calls of an emergency nature.

42.     During the week of February 6, 2019, Plaintiff left his desk at noon in order to purchase lunch to bring back to his desk and meet briefly with his HIV/AIDS Services Administration ("HASA") caseworker in the employee cafeteria during his lunch break in order to submit his pay stubs, as required by HASA in order to process the benefits it provided to Plaintiff.

43.     Prior to leaving his desk, Plaintiff told his team, as well as the HR office's other Assistant Personnel Director, that he was running over to the cafeteria and would be back as soon as possible.

44.     Minutes later, while Plaintiff was meeting with his HASA caseworker in the

cafeteria, Nedd called his personal cell phone and began loudly chastising him for leaving his desk, accusing him of missing a mock-audit request she falsely claimed had come in while he was away from his desk.

45.     Plaintiff's HASA caseworker overheard this loud chastisement and expressed shock that Nedd was addressing Plaintiff in this extremely hostile fashion.

46.     Minutes later, when Plaintiff returned to his desk, lunch in hand, Nedd severely reprimanded him for leaving his desk to get lunch, and for leaving his team "without direction" for the mock audit request.

47.     Plaintiff quickly learned that, contrary to Nedd's assertion, such request had not actually come in during his brief absence. Plaintiff pointed this out to Nedd and explained to her that, in any event, his team knew how to retrieve documents from their files if such a request were to come in during his brief absence – in which case, the audit rules give them until the close of business to provide the requested information, which meant they would have five hours to pull eight documents from eight files.

48.     Plaintiff further stated that, as an HIV patient utilizing HASA services, it had been necessary for him to step away to meet briefly with his HASA caseworker and provide his pay stubs, as HASA had prevented him from becoming homeless prior to being hired by the Hospital.

49.     Nedd looked at Plaintiff in disgust, dismissively responded that she did "not want to know" about his involvement with HASA and directed Plaintiff not to tell her about such things.

50.     Plaintiff replied that it was, in fact, necessary for him to tell her that he was meeting with his HASA caseworker as opposed to engaging in some sort of unnecessary

recreational activity.

51.    Nedd nonetheless insisted that he should not have left his desk for any reason.

52.    Nedd's directive was entirely illogical given the fact that Nedd had already relegated Plaintiff to the fourth floor public restroom, thereby causing him to spend additional time away from his desk for every trip to the restroom, and knowing that his disability required him to make frequent trips to the restroom.

53.    Furthermore, Nedd had told Plaintiff upon his hiring that he and his colleagues were entitled to an hour-long lunch break every day – a break which Plaintiff almost never took, choosing instead to eat at his desk while he continued working.

54.    Upon information and belief, other employees were not penalized for taking their lunch breaks or leaving their desks.

55.    Nedd later critiqued Plaintiff based on this incident in a subsequent written performance review, as a pretext for his termination (see, *infra,* ¶67).

56.    The mock audit request came in later that afternoon, and Plaintiff's team passed it successfully.

<u>Defendants Manufactured a Negative Evaluation of Plaintiff, and then Terminated Him Based on Variety of False and Pretextual Reasons</u>

57.    On or about March 6, 2019, Plaintiff received an email from the Hospital directing him to complete a self-evaluation of his job performance.

58.     This was surprising to Plaintiff, because according to NYCHHC's Operating Procedure ("OP") 20-43 for managerial reviews, "Newly hired or promoted employees shall be appraised after six months on the job" – not after just 90 days.

59.    At the time he received this email, Plaintiff had not received formal or written

critique whatsoever about his performance, let alone an "Unsatisfactory Performance Notice" ("UPN") pursuant to written NYCHHC policy.

60.     Furthermore, contrary to the NYCHHC "Instructions and Guidelines" for managerial performance appraisals, there had never been any "initial planning meeting" to set forth Plaintiff's performance goals, and there had never been any "progress reviews."

61.     The following morning, on or about March 7, 2019, Nedd informed Plaintiff that she had completed his formal performance evaluation and that he should check his email and print it out.

62.     In response, Plaintiff asked Nedd if she was sure it was time for his evaluation already, since NYCHHC policy dictates that the first evaluation takes place after six months of employment.

63.     Nedd replied: "Oh, I don't know, it just showed up in my system so it needs to be done and I completed it."

64.     Upon information and belief, this was not true and Plaintiff's evaluation form did not "show up" in the system at that time, as that is not how the PeopleSoft system was set up for HR personnel at the Hospital.

65.     Plaintiff protested that he had not yet had the opportunity to complete the self-evaluation form that had been emailed to him the prior afternoon, and that unlike his colleagues, he was being denied the opportunity to participate in his evaluation.  Nedd dismissively responded that his self-evaluation was not needed.

66.     Plaintiff then read Nedd's evaluation of him, which gave him an "Overall Summary" rating of "Needs Improvement," and also contained "Needs Improvement" ratings in various categories without any comments or examples, in violation of the policy on the front of

the packet, which expressly requires that the supervisor "provides comments/examples justifying each" rating of "Needs Improvement" in each category.

67.     Plaintiff immediately recognized that the evaluation included a series of provably false assertions about him, which he sought to clarify. For example:

- The evaluation stated that Plaintiff was "often observed on personal phone calls and is sometimes late to work." However, Plaintiff explained that he was only once observed on a personal phone call, and that was with his mother, following her medical emergency.

- Nedd then verbally asserted that Plaintiff was "chronically absent or tardy." However, as Plaintiff explained, (a) he had been tardy exactly once, due to a Hospital elevator malfunction; and (b) he had had a total of four absences, all of which were permissible and two of which had been pre-approved.[2]

- The evaluation falsely stated that "during a mock survey Abel left the building to conduct personal business and left his team without support. I [Nedd] had to step in and problem-solve on his behalf."  Plaintiff reminded Nedd that in fact, (a) the mock audit survey had not come in while Plaintiff had stepped away at lunch time to meet with his HASA case worker, (b) the other Assistant Personnel Director was there and he had not left his team "without support", and (c) Nedd had not stepped in and problem-solved on his behalf, as the mock audit had not yet come in and thus no problem had arisen to be solved.

---

[2] Plaintiff had used two days of earned and accrued sick time when he had been ill, and had used another two days paid time off ("PTO") caring for his mother following her medical emergency, which Nedd had approved in advance. Upon information and belief, Plaintiff's colleagues were not penalized for availing themselves of their earned and accrued sick time or PTO.

- The evaluation falsely stated that Plaintiff had not been proactive with reaching out to Ambulatory Care or establishing himself as an HR presence in that division. However, Plaintiff had emailed Ambulatory Care Director Alfredo Jones ("Jones") in January, right after being assigned to do so, but due to Jones' "EPIC" training, Jones had not been able to meet with him until February. After their meeting in February, Jones and Chief Medical Officer Michael Davita had each sent emails to Nedd lauding the meeting as well as Plaintiff's efforts generally in the Ambulatory Care division.

- Lastly, the review criticized Plaintiff in connection with an incident wherein another employee had falsely taken credit for Plaintiff's work.  Plaintiff explained to Nedd what had actually happened, but she blamed him for it nonetheless. [3]

68.     Plaintiff pointed out to Nedd that in each employee self-evaluation section, someone had typed: "Employee did not complete self-evaluation," falsely implying that he had declined to do so.

69.     In response, Nedd stated that the computer interface had auto-generated this statement, and that nobody had typed it in.  However, Plaintiff knew that was false, because he had audited several employee files during his time at the Hospital, and, in doing so, had seen evaluations where this box had been left entirely blank.

---

[3] On or about Friday, March 1, 2019, HR business partner Duane Davis ("Davis") had approached Plaintiff while Plaintiff was finalizing his work on an "HR Dashboard" he had been tasked with creating.  Davis asked Plaintiff a number of questions about this project and what it was intended to measure. Plaintiff enthusiastically explained the project in detail to Davis, including which particular data he was using, where such data was housed, and how the data would be presented in the HR Dashboard he was creating. The following Monday, March 4, 2019, Davis submitted Plaintiff's HR Dashboard work product to Nedd as though it were his own work product rather than Plaintiff's. When Plaintiff protested during his termination session that he had done this work and Davis had plagiarized it, Nedd condoned Davis' plagiarism of Plaintiff's work, stating that it showed that Davis was "hungrier" than Plaintiff. Nedd also blamed Plaintiff for Davis' having taken credit for Plaintiff's work product, stating that it was Plaintiff's own fault in that he was not "fast enough" to turn in his work before Davis could appropriate it and turn it in to Nedd as his own.

70.     Plaintiff then asked Nedd if he could now add his self-evaluation, since he hadn't had a chance to do so before, and she refused.

71.     Plaintiff asked Nedd if he was being placed on a CAP and/or be re-evaluated after three months, pursuant to written policy, and in accordance with the instructions on the front of the evaluation packet, which clearly and unequivocally state the following: "If the Overall Summary rating is 'Needs Improvement,' the supervisor must create a Collaborative Action Plan (CAP), and discuss it with the employee during their meeting."[4]

72.     Nedd replied that, in violation of policy, there would be no CAP and no further opportunity to improve.  Entirely ignoring Plaintiff's explanations regarding the many falsehoods contained in the evaluation, she notified Plaintiff that his employment was being terminated, with immediate effect.

73.     Plaintiff objected that, unlike other Hospital employees, he was never provided with any formal warning or counseling, let alone UPN, CAP or similar opportunity to improve the alleged shortcomings in his performance prior to re-evaluation.

74.     Plaintiff also objected that having been banned from the employee restrooms on his own floor and being made to use the public restroom on the fourth floor was especially onerous given his disability; in response, Nedd laughed and falsely claimed that Plaintiff did not in fact have a disability, and that he had never told her that he had a disability.

75.     Nedd stated that "this isn't going to work" and that her professional relationship with Plaintiff "would not be repaired".  She then handed him a pre-signed termination letter, and instructed him to go collect his belongings from his desk immediately.

---

[4] Further, the NYCHHC "Instructions and Guidelines" for managerial performance appraisal clearly state: "Employees rated as Needs Improvement (NI) must be reevaluated after three months," and that only "[e]mployees who receive a rating of Unacceptable (U) are subject to immediate reassignment or termination."

76.     Nedd then walked Plaintiff to his desk to collect his belongings, and shouted at the entire compliance team to go sit in the conference room while Plaintiff collected his belongings.  This entirely unnecessary directive served no purpose but to cause Plaintiff the maximum amount of humiliation.

The Effect of Defendants' Discriminatory Conduct

77.     As a result of the acts and omissions enumerated herein, Plaintiff has suffered, *inter alia*, lost wages, humiliation and emotional distress.

78.     Further, Plaintiff will not be eligible to resume HASA assistance while he is receiving unemployment benefits, which do not amount to enough to cover his rent.

79.     Plaintiff is therefore at imminent risk of becoming homeless, due to Defendants' unlawful acts and omissions enumerated herein, which directly caused the damages Plaintiff seeks to recover in this action.

## FIRST CLAIM
### ADA – Disability Discrimination
#### *Against Harlem Hospital and NYCHHC*

80.     Plaintiff repeats, realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

81.     Plaintiff has a disability within the meaning of the Americans with Disabilities Act of 1990, § 2 *et seq*., 42 U.S.C.A. § 12101 *et seq*., as amended by § 504 of the Rehabilitation Act of 1973 ("ADA").

82.     Defendants Harlem Hospital and NYCHHC are employers covered by this statute and had notice of Plaintiff's disability.

83.     Plaintiff was qualified and could perform the essential functions of his job, with or without reasonable accommodation.

14

84.     By the foregoing acts and omissions, including but not limited to Plaintiff's termination, Defendants, through their managerial employees and/or agents, engaged in unlawful disparate treatment of Plaintiff and discriminated against Plaintiff on the basis of his disability in the form of HIV, in violation of the ADA.

85.     Defendant Nedd's illogical and inhumane act of banning Plaintiff from the restrooms on his floor within weeks of his disclosing his disability in the form of HIV shows Nedd's animus toward his disability, in that she refused to use the same restroom as someone who was known to be living with HIV, although she had no issues using the same restroom with others who were not known to have this disability.

86.     Defendant Nedd's act in falsely accusing Plaintiff of having left the shared HR restroom in a "filthy" and "disgusting" condition, even in spite of incontrovertible evidence to the contrary, reflects her animus toward his disability and her attitude that persons living with HIV are dirty and/or unfit to share facilities with others.

87.     The visible disgust Nedd displayed when Plaintiff mentioned HASA to her, and her admonition that he refrain from even mentioning it, also shows her animus toward his disability.

88.     The close temporal proximity between (a) Plaintiff's disclosure of his disability and request for reasonable accommodations and (b) the onset of the pattern of adverse action against him culminating in his termination shows a strong causal connection between Plaintiff's disability and his termination.

89.     Defendant Nedd's laughing at Plaintiff's mention of his disability, as well as her bald-faced denial that she was aware of his disability at the time of his termination, also shows a causal connection between Plaintiff's disability and his termination.

90.     Lastly, the termination of Plaintiff's employment, for entirely false and pretextual reasons, shows discriminatory animus and constitutes retaliation in violation of the ADA.

91.     Defendants, as Plaintiff's employers, jointly and severally, acted intentionally and with malice and/or reckless indifference to Plaintiff's rights federally protected rights.

92.     As a result of the discriminatory acts and omissions of Defendants and their agents, Plaintiff has suffered and will continue to suffer irreparable injury, including monetary damages, mental anguish and emotional distress as a result of such unlawful practices, unless and until this Court grants relief.

93.     Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## SECOND CLAIM
### ADA – Retaliation
*Against Harlem Hospital and NYCHHC*

94.     Plaintiff repeats, realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

95.     Plaintiff has a disability within the meaning of the Americans with Disabilities Act of 1990, § 2 *et seq.*, 42 U.S.C.A. § 12101 *et seq.*, as amended by § 504 of the Rehabilitation Act of 1973 ("ADA").

96.     Defendants Harlem Hospital and NYCHHC are employers covered by this statute and had notice of Plaintiff's request for reasonable accommodations.

97.     Plaintiff was qualified and could perform the essential functions of his job, with or without reasonable accommodation.

98.     By the foregoing acts and omissions, including but not limited to Plaintiff's

termination, Defendants, through their managerial employees and/or agents, retaliated against Plaintiff on the basis of his requests for reasonable accommodation due to his disability in the form of HIV, in violation of the ADA.

99.     Defendant Nedd's illogical and inhumane act in banning Plaintiff from the restrooms on his floor within weeks of his disclosing his disability in the form of HIV and asking for the reasonable accommodation of easy and frequent access to a restroom shows her retaliatory animus toward his request for reasonable accommodations.  Nedd effectuated a scenario that was the exact opposite of the easy and frequent restroom access Plaintiff had requested as a reasonable accommodation, which also had the inevitable effect of needlessly humiliating him and causing him great physical discomfort on a day-to-day basis.

100.     Defendant Nedd's act in stripping Plaintiff of his office, within weeks of his asking for the reasonable accommodation of permission to occasionally lie down in his office and/or put his head down on his desk, also showed her retaliatory animus toward his request for reasonable accommodation, in that she effectuated a scenario wherein he no longer had an office to lie down in and no longer had any privacy.

101.     The close temporal proximity between Plaintiff's request for reasonable accommodations and the onset of the pattern of adverse action against him, culminating in his termination, shows a strong causal connection between Plaintiff's request for reasonable accommodations and his termination.

102.     Lastly, the termination of Plaintiff's employment, for entirely false and pretextual reasons, shows retaliatory animus and constitutes retaliation in violation of the ADA.

103.     Defendants, as Plaintiff's employers, jointly and severally, acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

104.     As a result of the discriminatory acts and omissions of Defendants and their

agents, Plaintiff has suffered and will continue to suffer irreparable injury including monetary

damages, mental anguish and emotional distress as a result of such unlawful practices unless and

until this Court grants relief.

105.     Therefore, Defendants are jointly and severally liable to Plaintiff for back pay,

front pay, emotional distress and other compensatory damages, prejudgment interest, post-

judgment interest, attorneys' fees, costs and disbursements.

### THIRD CLAIM
**(NYSHRL – Disability Discrimination)**
***Against All Defendants***

106.     Plaintiff repeats, realleges and incorporates by reference each allegation in the

foregoing paragraphs as though fully set forth herein.

107.     Plaintiff has a disability within the meaning of the New York State Human Rights

Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL").

108.     Defendants are employers covered by this statute and had notice of Plaintiff's

disability.

109.     Plaintiff was qualified and could perform the essential functions of his job, with

or without reasonable accommodation.

110.     By the foregoing acts and omissions, including but not limited to Plaintiff's

termination, Defendants Harlem Hospital and NYCHHC, through their managerial employees

and/or agents, engaged in unlawful disparate treatment of Plaintiff and discriminated against

Plaintiff on the basis of his disability in the form of HIV, in violation of the NYSHRL.

111.     As described herein, Defendant Nedd aided and abetted Defendants Harlem

Hospital and NYCHHC in their unlawful discriminatory acts against Plaintiff, in violation of

NYSHRL § 296(6).

112.    Alternatively, as HR Director, and in terms of the economic realities of the workplace, Defendant Nedd is liable as an employer for the continuing unlawful discrimination against Plaintiff  in violation of NYSHRL § 296(1).

113.    Acts and omissions showing causation and discriminatory animus are summarized in ¶¶ 85-90, *supra.*

114.    Defendants, as Plaintiff's employers, jointly and severally, acted intentionally and with malice and/or reckless indifference to Plaintiff's rights statutorily protected rights.

115.    As a result of the discriminatory acts of Defendants and their agents, Plaintiff has suffered and will continue to suffer irreparable injury including monetary damages, mental anguish and emotional distress as a result of such unlawful practices unless and until this Court grants relief.

116.    Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## **FOURTH CLAIM**
### **(NYSHRL - Retaliation)**
### ***Against All Defendants***

117.    Plaintiff repeats, realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

118.    By the foregoing acts and omissions, including but not limited to Plaintiff's termination, Defendants Harlem Hospital and NYCHHC, through their managerial employees and agents, retaliated against Plaintiff on the basis of his protected activity in the form of a

request for reasonable accommodations in violation of the New York Human Rights Law, N.Y.
Exec. Law §§ 290 *et seq*. ("NYSHRL").

119.    Plaintiff was qualified and could perform the essential functions of his job, with
or without reasonable accommodation.

120.    As described herein, Defendant Nedd aided and abetted Defendants Harlem
Hospital and NYCHHC in their unlawful retaliatory acts against Plaintiff, in violation of
NYSHRL § 296(6).

121.    Alternatively, as HR Director, and in terms of the economic realities of the
workplace, Defendant Nedd is liable as an employer for the continuing unlawful retaliation
against Plaintiff  in violation of NYSHRL § 296(1).

122.    The foregoing retaliatory actions to which Plaintiff was subjected could have
dissuaded a reasonable employee in Plaintiff's position from requesting a reasonable
accommodation.

123.    On the basis of his request for reasonable accommodations, Plaintiff was treated
disparately from other similarly situated employees who had not requested reasonable
accommodations based upon a disability.

124.    Acts and omissions showing causation and retaliatory animus are summarized in
¶¶ 99-102, *supra*.

125.    Defendants, as Plaintiff's employers, acted intentionally and with malice and/or
reckless indifference to Plaintiff's statutorily protected rights.

126.    As a result of Defendants' unlawful retaliatory acts, Plaintiff has suffered and will
continue to suffer lost wages and emotional distress unless and until this Court grants relief.

127.    Therefore, Defendants are jointly and severally liable to Plaintiff for back pay,

front pay, emotional distress damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## FIFTH CLAIM
### (NYCHRL - Disability Discrimination)
### *Against All Defendants*

128.    Plaintiff realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

129.    Plaintiff has a disability within the meaning of the NYCHRL.

130.    Defendants are employers covered by this statute, and had notice of Plaintiff's disability.

131.    Plaintiff was qualified and could perform the essential functions of his job, with or without reasonable accommodation.

132.    By the foregoing acts and omissions, including but not limited to Plaintiff's termination, Defendants Harlem Hospital and NYCHHC, through their managerial employees and/or agents, engaged in unlawful disparate treatment of Plaintiff and discriminated against Plaintiff on the basis of his disability in the form of HIV, in violation of the NYCHRL.

133.    As described herein, Defendant Nedd aided and abetted Defendants Harlem Hospital and NYCHHC in their unlawful discriminatory acts against Plaintiff.

134.    Alternatively, as HR Director, and in terms of the economic realities of the workplace, Defendant Nedd is liable as an employer for the continuing unlawful retaliation against Plaintiff in violation of the NYCHRL.

135.    On the basis of his disability in the form of HIV, Defendants treated Plaintiff differently and less well than other similarly situated employees who were not known to be living with HIV.

136.    Acts and omissions showing causation and discriminatory animus are summarized in ¶¶ 85-90, *supra.*

137.    Defendants, as Plaintiff's employers, jointly and severally, acted intentionally and with malice and/or reckless indifference to Plaintiff's rights statutorily protected rights.

138.    As a result of the discriminatory acts of Defendants and their agents, Plaintiff has suffered and will continue to suffer irreparable injury including monetary damages, mental anguish and emotional distress as a result of such unlawful practices unless and until this Court grants relief.

139.    Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## SIXTH CLAIM
### (New York City Human Rights Law - Retaliation)
### *Against All Defendants*

140.    Plaintiff realleges and incorporates by reference each allegation in the foregoing paragraphs as though fully set forth herein.

141.    Plaintiff has a disability within the meaning of the NYCHRL.

142.    Defendants are employers covered by this statute, and had notice of Plaintiff's request for reasonable accommodations.

143.    Plaintiff was qualified and could perform the essential functions of his job, with or without reasonable accommodation.

144.    By the foregoing acts and omissions, including but not limited to Plaintiff's termination, Defendants Harlem Hospital and NYCHHC, through their managerial employees and agents, as Plaintiff's employer, retaliated against Plaintiff on the basis of his protected

activity of requesting reasonable accommodations in violation of the NYCHRL.

145.    As described herein, Defendant Nedd aided and abetted Defendants Harlem Hospital and NYCHHC in their unlawful retaliatory acts against Plaintiff.

146.    The foregoing retaliatory actions to which Plaintiff was subjected could have dissuaded a reasonable employee in Plaintiff's position from requesting a reasonable accommodation.

147.    On the basis of his request for reasonable accommodations, Plaintiff was treated differently and less well than other similarly situated employees who had not requested reasonable accommodations based upon a disability.

148.    Acts and omissions showing causation and retaliatory animus are summarized in ¶¶ 99-102, *supra.*

149.    Defendants, as Plaintiff's employers, acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

150.    As a result of Defendants' unlawful retaliatory acts, Plaintiff has suffered and will continue to suffer lost wages and emotional distress unless and until this Court grants relief.

151.    Therefore, Defendants jointly and severally are liable to Plaintiff for back pay, front pay, emotional distress damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

**WHEREFORE,** Plaintiff Abel Saborit, Jr. demands judgment as follows:

**On the First and Second Claims (ADA):**

(a)      an order declaring that the acts and practices complained of herein are in violation of the ADA;

(b)      an order enjoining and permanently restraining these violations of the ADA;

(c)      an award of back pay in the amount of lost salary and benefits, including but not limited to health care premiums and other benefits of employment;

(d)      an award of front pay in the amount of lost salary, including but not limited to health care premiums and other benefits of employment;

(e)       an award of compensatory damages including but not limited to emotional distress damages;

(f)      an award of punitive damages;

(g)      attorneys' fees;

(h)      prejudgment and post-judgment interest;

(i)      costs and disbursements of this action; and

(j)      such other relief as this Court deems just and proper.

**On the Third, Fourth, Fifth and Sixth Claims (NYSHRL & NYCHRL):**

(a)      an order declaring that the acts and practices complained of herein are in violation of the NYSHRL and/or the NYCHRL;

(b)      an order enjoining and permanently restraining these violations of the NYSHRL and/or the NYCHRL;

(c)      an award of back pay in the amount of lost salary, including but not limited to health care premiums and other benefits of employment;

(d)      an award of front pay in the amount of lost salary, including but not limited to health care premiums and other benefits of employment;

(b)      an award of compensatory damages, including but not limited to emotional distress damages;

(c)      an award of punitive damages;

(d)      attorney's fees;

(k)      prejudgment and post-judgment interest;

(l)      costs and disbursements of this action; and

(m)      such other relief as this Court deems just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury in this action.


Dated:  New York, New York
        May 21, 2019



                                        Respectfully submitted,

                                        CRUMILLER P.C.

                                        _____/s/_____
                                        By: Chloe Liederman
                                        222 Broadway, 19th Floor
                                        New York, NY 10038
                                        Telephone: (212) 390-8480
                                        Fax: (917) 398-1150
                                        cl@crumiller.com
                                        Attorneys for Plaintiff