UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

```
                                             :
ABEL SABORIT, JR.,                           :
                                             :
                              Plaintiff,     :
                                             :
              -v-                            :
                                             :
HARLEM HOSPTIAL CENTER AUXILIARY, INC.,      :
NEW YORK CITY HEALTH AND HOSPITALS           :
CORPORATION, and KEESHA NEDD,                :
                                             :
                              Defendants.    :
                                             :
```

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___7/1/2021___

19-cv-4686 (LJL)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

LEWIS J. LIMAN, United States District Judge:

Plaintiff Abel Saborit, Jr. ("Plaintiff" or "Saborit") brings this action against Harlem

Hospital Center Auxiliary ("Harlem Hospital"), New York City Health and Hospitals

Corporation ("NYCHHC"), and Kesha Nedd ("Nedd," and collectively, "Defendants") to allege

that they discriminated and retaliated against him during his employment at Harlem Hospital and

when they terminated him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101

*et seq.* (the "ADA"), the New York State Human Rights Law ("NYSHRL"), and the New York

City Human Rights Law ("NYCHRL").

Pursuant to the agreement of the parties, the Court held a bench trial from June 1, 2021 to

June 3, 2021.  Eight witnesses testified either in person or, pursuant to the agreement of the

parties, remotely.  Those witnesses and the subjects as to which they offered testimony were (in

order in which they testified):  (1) Plaintiff Saborit, who testified regarding his experiences at

Harlem Hospital and the termination of his employment from Harlem Hospital; (2) Plaintiff's

sister, Katharine Saborit-Rodriguez ("Saborit-Rodriguez"), who spoke with her brother every

day or every other day and who testified regarding certain prior consistent statements allegedly

made by Plaintiff and to the impact of the termination of employment on Plaintiff; (3) Greycy

Rodriguez ("Rodriguez"), Plaintiff's former co-worker from Fresh Direct, who testified

regarding the Equal Employment Opportunity ("EEO") office at that prior employment and to

certain events after Plaintiff's employment was terminated from Harlem Hospital; (4) Marcia

Foster ("Foster"), Plaintiff's subordinate in the compliance department at Harlem Hospital, who

testified to Plaintiff's performance at Harlem Hospital and his supervision of the compliance

department; (5) Marisol Rico ("Rico"), another co-worker at Harlem Hospital, who also testified

to Plaintiff's supervision of the compliance department and his performance at Harlem Hospital;

(6) Keesha Nedd ("Nedd"), one of the Defendants, who testified to Plaintiff's performance at

Harlem Hospital and the reasons she terminated his employment; (7) Sandra Grimes-Davis

("Grimes-Davis"), a human resources business partner at Harlem Hospital, who reported to

Plaintiff for a time and who conducted the new employee orientation for him, who also testified

to Plaintiff's performance at Harlem Hospital; and (8) Dwayne Davis ("Davis"), a human

resources business partner who also reported to Plaintiff for a time and who testified to

complaints that he made to Nedd about Plaintiff's performance at Harlem Hospital.  In addition,

Plaintiff was recalled to testify in his rebuttal case.

     This opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to

Federal Rule of Civil Procedure 52.  For the following reasons, the Court finds that Plaintiff has

failed to establish liability on all claims.

## I.    <u>FINDINGS OF FACT</u>

     Plaintiff Saborit is a native of Miami, Florida.  He received a Master's degree in Human

Resources and Development from Barry University in 2006 and a Master's degree in Business

Administration ("MBA") from the University of Miami with an emphasis on healthcare

administration in 2012.

### A.      Plaintiff's Job Description and Orientation

On November 1, 2018, Plaintiff was hired by Defendants in the position of assistant personnel director in the human resources and operations department at Harlem Hospital, with a start date of November 5, 2018 and a salary of $85,000 a year plus benefits.  *See* PX1.  Prior to working at Harlem Hospital, he had almost 14 years of experience working in human resources and labor management.

Plaintiff worked as a human resources tech from 2004 to 2005, as a recruiter at Andryx Corporation from 2005 to 2006, as a human resources manager at Home Depot from 2006 to 2008, as a regional human resources business partner at Molina Healthcare from 2008 to 2012, and as a human resources manager at LSH Sky Chefs from 2012 to 2013.  He moved to New York in 2014 when he was hired as an employee and labor relations manager at Perrigo Pharmaceuticals.  He then worked as a senior human resources business partner at Fresh Direct from 2015 to 2017, and thereafter as a human resource director and insurance director at Consolidated Bus Company until August 2018.

The job at Harlem Hospital was a promotion with more responsibility than Plaintiff had been given at his prior jobs.  Plaintiff was to be a deputy to the human resources director, Nedd, and second in command in the human resources department at Harlem Hosptial.  Nedd is also a human resource professional with approximately 20 years of experience.  She has a bachelor's degree in business management with a concentration in human resources and an MBA from NYU.  She began working at Harlem Hospital in 2013 as a lean facilitator and then moved into operations.  She was hired as human resource director at Harlem Hospital in March 2018.  In that capacity, she managed a team of approximately 15 employees and was responsible for recruitment and employment, compliance and records, management, and wage and salary.

Upon commencement of his employment, Plaintiff was to have five direct reports.  He was tasked with supervising Foster, Rico, and another employee, Delrose Thompson ("Thompson") in their capacity as members of the compliance department.  However, he did not directly supervise or manage them until January 2019.  Trial Tr. at 187-89, 311, 345.  He also supervised Davis and Grimes-Davis who served as human resources business partners.  In or about January 2019, however, Nedd made the decision to direct Davis and Grimes-Davis, who had previously reported to Plaintiff, to instead report to her.  *See, e.g.*, *id.* at 54.

Harlem Hospital has at least two buildings, the Women's Pavillion and the Martin Luther King building.  Nedd split her time between the buildings.  *Id.* at 140, 172, 384.  Plaintiff initially was seated on the 6th floor of the Women's Pavilion building in an office suite with Nedd.  Nedd had an interior office and Plaintiff had a desk directly outside of her office near a door to the hallway that remained open during office hours.  There was a bathroom just outside Nedd's office.  There were five other bathrooms on the floor.  The compliance department was located in an office suite down the long hall from where Nedd's office was located.  There was a single person bathroom in the compliance department office suite.  There was also a bathroom on the corridor of the 6th floor that had a code.  After several months on the job, for reasons to be explained, Plaintiff's workspace was moved down the hall to the area in which the compliance department met.

Upon the commencement of his job, Nedd asked Plaintiff to familiarize himself with the organization and its policies and procedures, including the employee resource center on Harlem Hospital's intranet page.  On November 26 and 27, 2018, Plaintiff attended and completed a new employee orientation with "information specific to NYC Health + Hospitals / Harlem."  PX16. The orientation was attended by approximately 10 to 15 employees, Trial Tr. at 492, and, based

4

on the agenda, covered topics ranging from pastoral care, infection control, and HIPAA regulations to security awareness, patient safety and rights and responsibilities, emergency preparedness, cultural competency, workplace violence, and benefits, *see* PX16. The parties disagree as to whether topics or subjects were covered that were not on the agenda and specifically whether the name and contact number of Harlem Hospital's EEO officer, Nicole Phillips ("Phillips"), was provided. Plaintiff testified at trial that there were no speakers or topics covered that were not included on the agenda and that Phillips did not present at the orientation. Defendants presented evidence that Davis and Grimes-Davis presented at the orientation and, as was the routine practice, at least shared a slide with Phillips' name and contact number, as well as with her EEO responsibilities.

At the conclusion of the new employee orientation, Plaintiff signed a certificate of completion. *See* DXB. The certificate contained an acknowledgment by Plaintiff that he attended and completed the new employee orientation. Plaintiff also attested that he received information that was listed on the certificate of completion, including the "New Employee Orientation Self Study," "EEO Policy Statements," and the "Personal Telephone Usage Policy," and that it was his responsibility to "comply with all instructions." *Id.* Plaintiff testified that he signed the document based on the instructions of one of the employees in human resources and because he was told that he needed to complete it in order to be paid.

During the orientation, Grimes-Davis observed Plaintiff using his cellphone in violation of Harlem Hospital's telephone policy. Grimes-Davis, who was helping to organize the orientation, told Plaintiff that he should not use his cellphone but was met with the response that there was an online "sale" that Plaintiff could not miss. Trial Tr. at 489. She reported the incident, which was concerning to her, to Davis who, in turn, reported it to Nedd.

### B.    Plaintiff's Job Responsibilities

Approximately one month into Plaintiff's employment, on December 7, 2018, Nedd met with Plaintiff and formally presented Plaintiff with a functional job description as required by Harlem Hospital's policies and procedures.  Nedd confirmed to Plaintiff that the purpose of his position was to develop and enhance processes, to manage the coordination of human resources activities in the areas of compliance and the human resources business partner team, and to assist the human resources director with the general management of the human resources department.[1] The specific business partner team to which Plaintiff was assigned was ambulatory care.  The document presented by Nedd, which was signed by both Plaintiff and Nedd on December 7, 2018, contained a description of the purpose of Plaintiff's position consistent with Nedd's oral description: the assistant personnel director "develops and enhances processes and manages the coordination of human resources activities in the areas of compliance and the human resources business partner (HRBP) team," and "[a]dditionally, assists the HR Director with general management of the human resources department."  DXG.  The document also contains a summary of duties and responsibilities.  It states:

Compliance
- Oversees the analysis, maintenance, and communication of records required by law or local governing bodies, or other departments in the organization.

HRBP
- Conduct weekly meetings with respective business units.
- Consults with line management, providing HR guidance when appropriate.
- Analyzes trends and metrics in partnership with the HR group to develop solutions, programs and policies.

---

[1] Nedd described the business partnership as a relationship in which a human resources professional works with a business leader or multiple business leaders to help them meet their goals, for example, by changing management, realigning the work force, handling employee relations issues, or working on recruitment.  Trial Tr. at 376.

- Maintains in-depth knowledge of legal requirements related to day-to-day management of employees, reducing legal risks and ensuring regulatory compliance.
- Provides HR policy guidance and interpretation.
- Provides day-to-day performance management guidance to line management (e.g., coaching, counseling, career development, disciplinary actions).
- Directs employee relations counseling for supervisors and employees regarding personnel problems, job difficulties and development opportunities.  Consult with the labor department as needed/required.
- Works closely with management and employees to improve work relationships, build morale, and increase productivity and retention.
- Provides guidance and input on workforce planning and succession planning.
- Other projects and duties as assigned.
- Identifies training needs for business units.
- May participates [sic] in evaluation and monitoring of training programs to ensure success.  Follows up to ensure training objective are met.

<u>General Management</u>
- Develops and maintains a human resources system that meets top management information needs.
- Plans and conducts new employee orientation to foster positive attitude toward Company goals.
- Coordinates management training in interviewing, hiring, terminations, promotions, performance review, safety, and sexual harassment.
- Provides management direction and counseling. Supervises human resources staff as needed.

*Id.*

Either at that time or shortly thereafter—the record is unclear—Nedd met with Plaintiff and Davis to describe Nedd's conception of the business partner role.  The concept was important to Nedd who wanted to build the human resources business partner function and strengthen and focus the relationship between human resources and the business unit.  In essence, a human resources professional would be assigned to work with a business leader or multiple business leaders to help them accomplish their goals.  At the time, Davis was assigned several business partners, including partners in pathology and central sterile.  Based on the new organization, Davis would report to Plaintiff and not to Nedd to whom he had previously

reported.  The meeting was held in Nedd's office and during it, Nedd asked the two to meet with

their business partners and to create a system of how to present data in the form of a

"dashboard."  Davis ultimately created the dashboard, which he did by exporting data to Excel

from a software program called PeopleSoft, using a pivot table to run metrics, and then using the

graph feature to display the snapshot of how a particular department was performing and where

they needed support.  Trial Tr. at 520-21.

### C.     Plaintiff's Work in December 2018

The parties disagree on when Plaintiff was to begin certain of his responsibilities,

including supervising the compliance and human resources business partner teams.  Plaintiff

testified that Nedd gave him the expectation that he was to start supervising the two departments

only at the beginning of 2019 because she expected him to be solely focused on an audit project.

*See, e.g.*, *id.* at 180.  Nedd testified that Plaintiff was to assume the supervisory responsibilities

immediately after the December 7, 2018 meeting.  *See, e.g.*, *id.* at 385-86.

In either event, on December 21, 2018, Nedd asked Plaintiff to move his working

location from the desk next to Nedd's office, which was outside of the eyesight of the

compliance team, to the area on the same floor where the compliance team sat.  Nedd expressed

the concern that Plaintiff was not interacting sufficiently with the compliance team because he

was mostly at his desk during the day, which was down the hall from the team.  She also was

concerned because he had not presented her with any improvement efforts for the team.  Further,

Nedd raised with Plaintiff a concern that one of his supervisees on the compliance team, Rico,

had an absenteeism issue.

Plaintiff did not meet with the ambulatory care or compliance teams in December 2018.

Instead, Plaintiff spent the bulk of his time in November and December 2018 overseeing the

audit of the files of all active and terminated employees of the hospital to ensure that they had the

appropriate I-9 forms and other documentation to verify that each employee was authorized to be employed in the United States (the "I-9 audit").  It is undisputed that Nedd assigned him the project with deadline of December 31, 2018.  During the project, Plaintiff worked either at his desk or in a space near the compliance department but out of its view.  *Id.* at 19, 45; PX13. Plaintiff submitted as an exhibit one email he sent to Nedd with summary update on his work to which she responded, "Perfect summary template. Thank you for the update."  PX5.

Plaintiff met with the compliance team on January 4, 2019.  Trial Tr. at 49-50.  That meeting involved Plaintiff and compliance team members Thompson, Foster, and Rico.  Plaintiff testified that, notwithstanding the positive reception he received at the meeting from the compliance team, Nedd was critical of him.  The following Monday, she called Plaintiff into her office and told him that it had come to her attention that the meeting had gone past what was scheduled (two hours rather than one hour) and that he should not let meetings go longer than scheduled in the future.  *Id.* at 52-53.

Also in January 2019, Plaintiff moved 25 to 30 feet from his desk in a private office near Nedd to a desk in a public area next to the compliance team.  He still sat on the 6th floor where there were six bathrooms, some of which were in the compliance area.

### D.   Conversations between Plaintiff and Nedd in January 2019

The month of January 2019 marked a turning point in the relationship between Plaintiff and Nedd.  At some point, Davis shared with Nedd complaints that Davis claimed he had heard from the compliance team about Plaintiff.  There were complaints about favoritism and lack of leadership; Plaintiff favored Rico and went to lunch with her almost every day to the exclusion of other members of the team.

In early January 2019, Nedd informed Plaintiff that the human resources business partners, Davis and Grimes-Davis, would no longer report to him and would instead report

directly to her.  Plaintiff testified at trial that Nedd did not explain why she had decided to switch the reporting structure.  Trial Tr. at 54.  Nedd testified Plaintiff had provided no guidance "at all" to other business partners or his compliance team, which was why she decided to have Davis and Grimes-Davis report to her.  *See, e.g.*, *id.* at 421.  She also testified that she would check in with him about meeting with the ambulatory care unit but that Plaintiff provided no information with regards to his ability to meet with them.  He also provided excuses as to why he was not able to complete the dashboard project that she had assigned him during the December 7, 2018 meeting. *Id.* at 407-08.

On January 22, 2019, Nedd called Plaintiff into her office to complain about the condition of the restroom that the two of them shared next to her office.  Nedd testified that during the fall of 2018, she had observed issues with respect to the cleanliness of the bathroom a few times per week.  The only persons with a key to the office space that Nedd and Plaintiff shared, and where the bathroom was located, were Nedd, Plaintiff, and Quick.  *Id.* at 71.  When "it just got to a point where [she] wasn't able to take it anymore," she decided to approach Plaintiff and told him that the restroom had been left the previous week in a conditional that was filthy and unacceptable.  *Id.* at 395-96.  Nedd and Plaintiff offer similar accounts of the conversation.  According to Nedd, she asked Plaintiff that he use a different bathroom when he defecated, and she suggested that he use a bathroom on the fourth floor because it was larger, had more stalls, and was outside of a work space conferring more privacy.[2]  She did not say anything about the other bathrooms on the 6th floor because she "only asked him to not defecate in the bathroom that we shared," nor did she say anything about announcing to others when he

---

[2] Nedd explained that the 4th floor bathroom gets cleaned more regularly because it was not within an office.  Trial Tr. at 434.

was to go to the bathroom.  *Id.* at 396-97.  Plaintiff responded "okay."  *Id.* at 398.  According to

Plaintiff, Nedd said that "to avoid any misunderstandings" going forward, she was "requesting"

that Plaintiff use the restroom on the fourth floor that was available for public use and he should

inform someone if he needed to use the restroom on another floor.  *Id.* at 70-71.  Plaintiff

responded that he could not have been responsible for the condition of the restroom because he

was not working at the office on the previous Friday, but Nedd "brushed" off the comment.  *Id.*

at 71.

Plaintiff testified that he complied with Nedd's request and left the floor to use the

restroom and he informed his colleagues when he was going to do so but that testimony was not

corroborated.  He denied at trial that it would take him less than five minutes to get to the 4th

floor restroom, stating that it would take him 5-10 minutes, but that testimony was inconsistent

with his deposition testimony.  *Id.* at 191-95.  He also testified that after his office was moved

next to the compliance team, he limited the extent to which he put his head down on his desk

because his staff would be able to see him.  *Id.* at 84.  Whereas previously when he had to

change his shirt due to excessive perspiration, he was able to use the restroom next to his desk,

after the move and after Nedd's instruction regarding the use of the restroom, he went down to

the fourth floor to change his clothing.  *Id.* at 85.  He also testified that for most of the time he

was working only one of three elevators was functioning so that he had to factor in additional

time that he would be away from his desk.  *Id.*

E.     **The January 2019 TJC Mock Survey**

In January 2019, Plaintiff and the compliance team began preparing for and then actually

conducted a mock survey for the joint commission ("TJC mock survey").  The TJC mock survey

is done to prepare the hospital for an audit conducted by the joint commission to determine

whether the hospital should continue to be accredited.  *Id.* at 54.

Plaintiff was the lead contact person for human resources on the TJC mock survey. He was responsible for receiving communications from quality management or a surveyor and sharing that information with members of the human resources team so that each member of the team could do his or her job. The actual survey is critical for the hospital and the compliance team plays an important role. If the survey goes poorly, depending on the findings, a hospital can lose its license. In addition, the results of the survey can determine whether the hospital will receive reimbursement from Medicaid and Medicare.

The role of the compliance team is to prepare the files in preparation for the joint commission. During the mock survey, the quality management department would send to Nedd and Plaintiff a list of files to be reviewed either by name or by title. Plaintiff would then distribute the list to his team. The compliance team's job then would be to go to the file room and pull and review the files to ensure the relevant documentation was present. If files or documentation were missing, that information would be shared with Nedd and with the department managers with a deadline for when to submit the documents to be inserted into the file in preparation for the survey. The quality management team would contact the compliance team to obtain information to be provided to the outside surveyors who would evaluate the materials.

The actual TJC mock survey occurred in late January 2019. The compliance team was expected to be prepared to respond with a file requested by the mock surveyors as if the request were made by the TJC during an actual audit. Nedd indicated that the process was fast-paced where the "hope" was to "get the information quickly so that [they] can provide it to surveyors quickly . . .[b]ecause the expectation from surveyors is when they ask for something, they get it." *Id.* at 400. The audit lasted four days.

On January 29, 2019, in the middle of the audit, an issue arose with respect to the TJC mock survey.[3]  Quality management sent Nedd and Plaintiff an email requesting files based on titles, thus requiring compliance to determine the names itself, which it would have to do by running a report and sorting by department, title, and day of hire to determine the files to be pulled.  At the time, Plaintiff had left the compliance area both for lunch and for a personal meeting and had done so without informing Nedd.  As a result, Nedd received calls and emails from quality management and the executive office that the files they had requested had not been delivered.  Nedd went to the compliance area, observed Plaintiff was not present, and called Plaintiff who told her that he was "at lunch or something"; she could not remember specifically. *Id.* at 413.  Nedd then ran the work report herself and generated the file names for the compliance department to pull the files and audit them.

On the last day of the survey in January 2019, Plaintiff attended a meeting with Nedd, Rico, Davis, Davis, and the CEO of the hospital.  Nedd described Plaintiff as behaving "immaturely" at the meeting.  *Id.* at 405.  Nedd made a decision that she would not be able to bring Plaintiff to such meetings in the future.  The incident contributed to the negative impression Nedd was developing of Plaintiff as a person who was not a role model of good behavior, and she counseled him thereafter that it was important for him to be present during the TJC mock survey and not to be away.  After the TJC mock survey, in February 2019, Nedd decided that she would terminate Plaintiff's employment.  *Id.* at 424.

---

[3] Plaintiff testified from his review of emails that it was on January 31 and not January 29 that the incident occurred.  Trial Tr. at 67; PX6.  The difference in date is not material to the Court's conclusions.

F.     **Plaintiff's Disability**

Plaintiff identifies as a person living with human immunodeficiency virus ("HIV") and he was diagnosed with HIV in 2008.  He is required to take antiviral medication and visits a doctor's office every three months for laboratory work and to determine whether the medication is working.  Plaintiff experiences side effects from the medication, such as profuse sweating, an upset stomach with loose bowel movements, and dizzy spells that can give him a feeling of vertigo.

The parties hotly dispute whether Plaintiff informed Harlem Hospital of his disability and requested an accommodation.  Plaintiff testified that he informed Nedd of his disability and requested an accommodation on the morning of December 13, 2018.  He was specific about the date.  The previous week, on December 6, 2018, Plaintiff had requested permission to either leave work an hour early without pay or arrive an hour later without pay so that he could schedule a doctor's appointment.  He did not mention why he needed to see the doctor and Nedd denied the request explaining that he had not accrued the time necessary to leave early or arrive late.  *Id.* at 22.

According to Plaintiff, the following week on December 13, 2018, shortly after Plaintiff arrived at work at 9:30 a.m., he went to Nedd's office and asked to speak with her.  He did so because he was not feeling particularly well from the medications.  Plaintiff explained to Nedd that he was a person living with HIV and that he experienced side effects from his medication: he was prone to excessive sweating, he needed to have easy access to the bathroom so that when his stomach was acting up he would be able to get to the bathroom in time, and if he experienced a dizzy spell, he needed to be able to close his eyes and put his head down on his desk until the spinning subsided.  Nedd agreed to make the accommodations.  *Id.* at 23-24.  Plaintiff also asked, because he was getting his laboratory results from his doctor that day, if there was

anything he should take from his doctor to present proof of his request for the accommodation. *Id.* at 24.  Nedd stated that she was not aware of any documentation that he needed to substantiate his request for an accommodation or any form that he needed to complete.  *Id.*  The conversation then turned to other subjects, namely the search for a candidate for a human resources business partner position on which Plaintiff was working.  *Id.*  Plaintiff testified that the request for accommodation he made to Nedd was similar to those he made and received at his prior employment with Perrigo and with Fresh Direct.  *Id.* at 9-10.

Plaintiff's testimony was corroborated by that of his older sister, Saborit-Rodriguez, with whom he would speak daily or at least every other day.  Saborit-Rodriguez is also employed in the human resources field.  Plaintiff believed that it was odd that he would not need to complete a form for his request for a disability but "as a new employee [he was] not going to rock the boat" when his supervisor stated that she was not aware of any documentation he needed to bring in from his physician.  *Id.* at 26.  He spoke to his sister in the evening on December 13 on the commute home from work and asked her whether it was odd that he would not have to complete a form.  After receiving advice from his sister that he should document the conversation with Nedd so that he would be able to reference it if necessary in the future, he proceeded to do so. *Id.* 29-30.  The record he created was received on redirect examination after his direct testimony was challenged as a recent fabrication.  The note states in relevant part:

> 12/13/2018- I met unscheduled and informally with K. Nedd when I arrived to the office.  I decided to speak with her in the morning because I was feeling very ill that day due to the side effects of my medication.,  I told her of my Medical Condition (that I was HIV Positive) and requested if I could have permission to 1. Lie Down or put my head down while I had the side effects of my medication pass. 2. Change clothes if needed if my sweating became so bad because of the medication in the rest room 3. Be able to use the rest room frequently if needed due to the side effects of the medication with [sic] occasionally give me cramps and loose bowel movements which had me going to the rest room frequently.  I asked K. Nedd if the corporation had any form that I could provide to my doctor to

formalize the requests (Being Interactive Process with the Company on accommodations). She said no, it was okay, she was not aware and what I was requesting was not out of this world.

PX15A.

Nedd denied that Plaintiff told her anything about his disability or the need for an accommodation. The first time she heard of his disability was when she informed him that his employment at Harlem Hospital would be terminated. She testified specifically that Plaintiff did not tell her in December 2018 either that he had a disability or that he needed an accommodation.

Nedd's testimony was corroborated by a "Request for Leave or Approved Absence" form submitted by Plaintiff on December 18, 2018, requesting an unscheduled 7-hour leave of absence for December 13, 2018. PX11. Nedd signed the document on December 18, 2018, retroactively approving Plaintiff's absence from the office on December 13, 2018. According to Nedd, the document establishes that Plaintiff was not in the office at all on December 13, 2018.

The form is accompanied by Plaintiff's time sheet for the week signed by both Plaintiff and Nedd and also submitted on December 18, 2018. The time sheet for December 13, 2018, reflects a start time of 9:30 a.m., but that start time is crossed out, suggesting that he did not in fact start work at 9:30 a.m. on December 13. There is no end time recorded. Plaintiff testified in his rebuttal case that it was his practice to put in the start time first thing in the morning when he came in and that he wrote 9:30 a.m. on the morning of December 13, when he came into work.[4] Trial Tr. at 544-45. For other days when he was not present in the office, he placed X's next to both the start and the end times. He testified that he did not list an end time for December 13 because he was rushing out of the office that day to see his doctor who was staying past hours and that he forgot to sign out. He had no good explanation for why he would request a 7-hour

---

[4] The cross-out is initialed but both Saborit and Nedd denied that the initials were theirs.

leave of absence—a full day that would reduce the limited bank of accrued hours that he could use for future leaves—when, in fact, he worked most of the day on December 13.  He admitted that a leave of absence could be granted for a time period as short as one hour and that he would have accrued only limited hours of sick leave from which he could draw the seven hours for December 13 given his short tenure at Harlem Hospital.  His testimony was that he wrote seven hours because "I was instructed by Ms. Nedd to put seven hours for total hours."  *Id.* at 546.  Although Plaintiff denied that the cross-out and initials were his, he admitted that it was the policy of the hospital that if an employee wanted to change a marking on their time sheet they were to cross it out and initial it.  *Id.* at 556.

For her part, Nedd denied that she was the one who crossed out the 9:30 a.m. start time.  She speculated that Plaintiff initially and after December 13 (but before submitting the time sheets) wrote 9:30 a.m. before realizing that he did not start work that day and, after realizing that he would be able to use sick pay for that day, he decided to cross out the time himself.

In the end, the more powerful inference (and the one that the Court draws) is that Plaintiff did not work on December 13, 2018 and therefore did not inform Nedd of his disability or request an accommodation on that date.  There would be no reason for him to request seven hours of sick leave if, in fact, he worked even part of the day on December 13.  Seven hours of paid leave for an employee who has just started his employment is not a small thing.  In fact, another document, from just one month after December 13, shows Plaintiff paying close attention to the number of hours he had available for leave.  *See* PX8 (January 16, 2019 email from Saborit to Nedd asking to take a day off in February: "I checked my time, I have 21hrs annual currently so I think that can cover the two days!").  As Plaintiff admitted, it was Harlem Hospital's policy that an employee who wanted to change an entry on a time sheet would cross

17

out and initial the time.  The most plausible inference is that Plaintiff was the one to change the

time, effectively admitting that he did not work on December 13.  That conclusion is bolstered

by the absence from the time sheet of any end time for December 13, further suggesting that he

did not work on that date.  Although Plaintiff testified that he was in the office until

approximately 4:30 p.m., one hour earlier than his usual end time, and simply forgot to put in a

time as he was rushing out the door, that testimony is called into question by the fact that there

are no other dates on the timesheet where he "forgot" to list his end time and, in any event, does

not explain why he would not have put in an end time for December 13 when he arrived at work

the next day and noticed the blank end time.  Trial Tr. at 557-58.  The contrary conclusion is that

Nedd or another administrator, Andrea Quick, crossed out the time 9:30 a.m., but there is no

evidence to support that conclusion.  Nedd persuasively denied making the cross-out and Quick

was not called as a witness.

To reject Nedd's testimony, one would have to assume that she had an interest as far back

as December 18, 2018 in making a case that Plaintiff was not present in the office on December

13 and that she was willing to violate Harlem Hospital policy to further that interest.  But before

December 18, 2018, Harlem Hospital had not taken any of the actions that Plaintiff now claims

to be discriminatory or retaliatory and Nedd would have had no inkling as of that date that

Plaintiff might pose a threat (litigation or otherwise) to her much less that the date of December

13 would be important.  It is implausible that Nedd was the one to cross out the time.  Finally,

one need not reject the notion that Plaintiff had a practice of noting his time on the time sheets

first thing when he came in in the morning in order to conclude that the cross-out was his and

reflects his admission that he was not present on December 13.  The practice at Harlem Hospital

was that the time sheets for each week were kept in folders at the Hospital and were not turned in

until the beginning of the following week.  *Id.* at 453.  If, in fact, Plaintiff entered the time of

9:30 a.m., he could have done so first thing on the morning of Friday, December 14, 2018, or on

Monday, December 17, 2018, before realizing that the better practice was not to record a start

time at all and to reflect the leave time on December 18, 2018.  The Court finds that Plaintiff has

not proved he was in the office on December 13, 2018 or that he presented his disability and

request for an accommodation to Nedd on that date.

The inference is bolstered, but only slightly, by the evidence offered by Defendants that

Plaintiff was informed at his orientation session of the identity of the EEO officer, Nicole

Phillips.  Two witnesses who were present and who had not spoken to one another in advance

both testified that Plaintiff would have been given at the orientation the name of the EEO officer

and her contact information to submit a request for accommodation.  Plaintiff signed a

certification indicating that he received and would follow the EEO policies.  Plaintiff also was a

human resources professional who had enough self-confidence to stand up to Nedd and advocate

for an employee whom he thought Nedd was treating unfairly.  *See id.* at 107.  Further, he was

sensitive enough to the question of whether it was sufficient to make an oral request to—by his

own account—contact his sister and ask her whether he needed to submit a form.  He had made

requests for accommodations in the past and had had to submit medical evidence in doing so.  If

one were to accept his testimony that he had the fortitude to request the accommodation orally

and the foresight to consider whether the oral request was sufficient, it would be difficult to

understand why he did not take the next step of checking Harlem Hospital's procedures or at

least, putting his request in writing in the form of an email to Nedd.  The more powerful

inference is that he did not have the conversation.

Finally, the evidence submitted by Plaintiff, in the form of a prior consistent statement to his sister and of the diary entry recording a conversation on December 13, is not sufficient in the Court's mind to overcome the weight of the evidence presented by Defendants.  Saborit-Rodriguez is plainly an interested witness.  She cares deeply about her brother and speaks with him at least every other day.  The Court is convinced that she worries above all about her brother's welfare and that she has an interest in her brother's case.  It was also she who, before hearing the evidence on both sides, jumped to the conclusion that Plaintiff was a victim of discrimination after learning that he was instructed not to use Nedd's bathroom, and expressed that view to Plaintiff.  *Id.* at 284.  As for the diary entry, that is important evidence in Plaintiff's favor, but its force is diminished by the absence of any documentary evidence demonstrating when the entry was created.  It is also diminished by the question, never convincingly answered at trial, of why, if Plaintiff thought it important to create a contemporaneous record of the purported conversation he had with Nedd, he did not also put that record into the form of a communication to Nedd or to anyone else at Harlem Hospital.

### G.      Plaintiff's Evaluation and Termination

In the late afternoon of March 6, 2019, Plaintiff received an email from Harlem Hospital directing him to complete a self-evaluation of his job performance.  These self-evaluations are a part of the employee review process.  They consist of a web-based form for employees to complete.  The employee's comments for the self-evaluation would then be exported to the manager's performance evaluation of the employee so that the comments are displayed next to each other.  *See* PX3.  Plaintiff did not complete the form that afternoon.  He testified that he believed he would have at least until the following morning to complete the form and wanted to do a good job and to locate the information that would support his self-evaluation.

20

The next morning, on March 7, 2019, Nedd met Plaintiff when he arrived at work and asked him to print out his self-evaluation. The two then met in her office and reviewed Nedd's performance evaluation of Plaintiff.

The performance evaluation rates an employee on a number of different performance criteria. An employee can receive one of three possible ratings in each category: exceeds expectations, meets expectations, or needs improvement. "Exceeds Expectations" was defined as "consistently exceeds expectations in all essential areas of responsibility, and the quality of work overall is excellent." *Id.* "Meets Expectations" was defined as "consistently meets expectations in all essential areas of responsibility (at times possibly exceeding expectations) and the quality of work overall is satisfactory." *Id.* "Needs Improvement" was defined as "does not consistently meet expectations in one or more essential areas of responsibility." *Id.* There are 16 performance criteria with one last "overall summary" section.

Plaintiff received 8 ratings of "Needs Improvement" and 8 ratings of "Meets Expectations." *Id.* He did not receive any "Exceeds Expectations." His overall rating was "Needs Improvement."

Specifically, Nedd rated Plaintiff as "Needs Improvement" for the category "Quality Improvement & Outcomes." She wrote "upon hire, Abel has not produced the HR metrics dashboard nor streamlined the work functions of the compliance team." *Id.*

Nedd rated Plaintiff as "Needs Improvement" in the category "Patient/Employee Experience." She commented that "as the HR business partner for ambulatory care, Abel did not proactively introduce himself to the division leaders and has not established himself as an HR presence amongst the managers and employees." *Id.* As Nedd expressed it at trial, Plaintiff had

not engaged in any interactions with the ambulatory care division to which he was assigned. Trial Tr. at 420.

Nedd rated Plaintiff as "Needs Improvement" in the category for "Culture Change & Responsiveness." She did not add comment in the evaluation. At trial, Nedd explained the basis for the rating. She believed the category addressed issues as to which she elsewhere provided ratings and commentary. She believed that Plaintiff needed improvement in "Culture Change & Responsiveness" because he had failed to collaborate with stakeholders to implement change and to transform care and because he had not established relationships with his human resources business partners. *Id.* at 420-21.

Nedd rated Plaintiff as "Needs Improvement" in the category for "Business and Individual Goals." She did not add commentary in the evaluation. At trial, Nedd testified that the reason for her rating was the same as her reasons elsewhere: "[U]p until this point he had not presented one [aspect of the human resources business partner framework] to me, the metrics, and the metrics are the same thing as the dashboard." *Id.* at 420.

Nedd rated Plaintiff as "Needs Improvement" in the category for "Accountability/Ownership." The comment states: "Abel requires constant reminding to complete assigned projects and tasks." PX3. Nedd explained at trial that the comment was based on Plaintiff's lack of proactivity. Nedd had to constantly remind him or ask him for updates. Trial Tr. at 421.

Nedd rated Plaintiff as "Needs Improvement" in the category for "Team Leadership." The comment states: "Abel is often observed on personal phone calls and is sometimes late to work. This is not acceptable behavior that a manager should role model to their subordinates or other colleagues. Additionally, during a TJC mock survey, Abel left the building to conduct

personal business and left the team without support.  I had to step in and problem solve on his behalf."  PX3.

Nedd rated Plaintiff as "Needs Improvement" in the category for "Team Development and Engagement."  The comment states: "Abel has not demonstrated this competency with his staff of the employees in his assigned business area."  *Id*.

Finally, in the category of "Managerial Competency," Nedd rated Plaintiff with a "Needs Improvement" with no commentary.  *Id*.

Plaintiff received ratings of "Meets Expectations" in the categories for "Access to Care," "Financial Responsibility," "Cultural Diversity," "Customer Service," "Job Effectiveness and Efficiency," "Core Competencies," "Collaboration," and "Financial Skills."  In particular, with respect to "Job Effectiveness and Efficiency," Nedd commented: "Abel executes tasks well, however, he is not effectively managing the compliance team.  Performance and process improvements discussed have not manifested."  *Id*.  There are no specific comments for most of the other categories.  Nedd explained at trial that "[i]n collaboration he definitely was helpful. When asked to do something, he would do it, and sometimes, he would initiate doing asks.  But again, for management, he was hired to be a leader not a front line worker."  Trial Tr. at 422.

 When asked why she was ultimately dissatisfied with Plaintiff's performance, Nedd answered:

> Because he hadn't established himself as a liaison for HR for the ambulatory care division and I didn't see where he was collaborating with them.  He didn't provide the HR business partner tool that we had discussed and that he said he could provide.  I didn't see any process change recommendations for the compliance team.   There was no streamlining. I didn't know who owned what process. Everyone kind of did everything.  And I didn't feel like I could rely on him.

*Id.*

During the meeting, Plaintiff offered comments that Nedd testified she did not believe were valid.  At the conclusion of the meeting, Nedd informed Plaintiff that he would not receive a collaborative action plan, which is given to employees whom Harlem Hospital decides to retain, and said that his employment was being terminated effective immediately.  In his own words, Plaintiff "got upset and blew up a bit." *Id.* at 136.  Plaintiff testified that at the time Nedd told him he was being terminated, he said he would seek out legal representation because he felt his treatment had been unfair and discriminatory.  *Id.* at 233.  Nedd similarly testified that Plaintiff threatened to sue her for discrimination based on his disability.  *Id.* at 426.  Both Plaintiff and Nedd testified that Nedd responded by saying that she did not know anything about Plaintiff having a disability, *id.* at 137, 426, and Nedd testified that Plaintiff had told her that he had disclosed his disability in his application, *id.* at 426.  Nedd asked Plaintiff to gather his belongings and asked the staff that was present to wait in the conference room while he was doing so.  *Id.* at 137-38, 426.  Plaintiff went into the conference room to say farewell and left Harlem Hospital.  *Id.* at 138, 426.

The termination letter signed by Nedd, dated March 7, 2019, states that Plaintiff was "being separated from his employment as a managerial employee of NYC Health + Hospitals, effective immediately."  PX4.  In the letter, Nedd stated that Plaintiff was being terminated because he "ha[d] not met the performance expectations as an Assistant Personnel Director."  *Id.*

Plaintiff claims his performance evaluation and termination were pretextual.  He testified that he did not receive any written warnings and was not asked to attend any meetings about his job performance or his failure to meet expectations before receiving the evaluation and being terminated.  He also testified that he did not receive any training or onboarding from Nedd.  According to Plaintiff and others, Nedd was not present on the 6th floor of the Women's

Pavilion where Plaintiff sat more than approximately 30-40 percent of every day, and Nedd did not visit the compliance area often and thus would not have been in a position to rate Plaintiff. *See, e.g.*, Trial Tr. at 140-41. Plaintiff also offered evidence that while Davis spoke to Nedd about Plaintiff's performance and was copied on at least one email in which Plaintiff's performance on the TJC mock survey was at issue, *see, e.g.*, PX7D-7E, Nedd did not speak to any of Plaintiff's other direct subordinates.

At trial, Plaintiff offered evidence to rebut each of the criticisms. He testified that he did not receive the dashboard assignment until after February 4, which was outside the review period, and the date for completion of that project was March 4, also outside the review period and just days before the evaluation. Trial Tr. at 99-100. In any event, Plaintiff claimed that the dashboard was completed, albeit by Davis whom he claimed stole Plaintiff's work and passed it off to Nedd as his own. He testified that the only way in which he failed to streamline the work functions of the compliance department was that he refused to terminate the employment of Rico, which action he believed to be unjustified. He further testified that Nedd herself did not understand the compliance department. Rico was still working at Harlem Hospital thus providing evidence, in Plaintiff's mind, that the blame he received for not terminating her was unjustified and pretextual.

With respect to the alleged failure to make contact with the ambulatory care unit, Plaintiff admitted that he did not meet with the unit until the first week of February but testified that he was not at fault for that delay. He had contacted the director of ambulatory care to set up a meeting immediately after being given the position as the human resources business partner for ambulatory care, but the director was not able to meet until the first week of February. He stated that the only project that he had failed to complete on time was the dashboard and that Nedd

never gave him a reminder to complete something that was outstanding.  Plaintiff had never

previously received criticism from Nedd with respect to his role in collaborating with

stakeholders, with his business and individual goals, or with his ability to hold people

accountable to standards of performance.   He had received only thank you emails from her.

Plaintiff testified that Nedd had observed Plaintiff only on one phone call and that was for a

personal emergency.  He did not receive criticism for the call.  Plaintiff was late on only three

occasions: once when he was stuck in the subway and twice when he was stuck in the elevators

at work.  He received no warnings about tardiness.

Finally, with respect to the TJC mock survey, Plaintiff claims that Nedd's account of the

events of that day is inaccurate: Plaintiff scheduled a brief meeting during his lunch break with

his HASA caseworker, so that Plaintiff could un-enroll from a public benefits program for

people living with HIV.  He met with the caseworker at Harlem Hospital, but in the cafeteria.

There was no rule against taking a lunch break.  While Plaintiff was meeting with the case

worker, Nedd called and screamed at Plaintiff that a request had come in while he was not at his

desk.  Plaintiff immediately went to Nedd's location and explained to her where he had been.  He

found that Nedd had not actually forwarded the request to the relevant people in his department,

so they could not even start addressing the request while he was at the cafeteria.  In the end, the

TJC mock survey was successfully completed notwithstanding Plaintiff's absence.

Defendants disputed Plaintiff's evidence.  Nedd testified that she gave Plaintiff the

dashboard assignment at the beginning of his employment; that testimony was corroborated by

Davis.  It also is corroborated by Plaintiff's "Functional Job Description," provided to him on

December 7, which lists development and maintenance of "a human resources system that meets

top management information needs" as one of his responsibilities.  DXG.  Plaintiff failed to

complete the dashboard assignment—Davis took the project on his own initiative and was able to complete it quickly, within ten minutes. *See, e.g.*, Trial Tr. at 520-21. Davis testified that Plaintiff had been assigned the task for about three weeks before he ultimately took it over; in the second week, Plaintiff had created "something," but Davis decided to create a new dashboard because he found Plaintiff's work to be inadequate. *Id.* at 520. Plaintiff took no action to streamline the compliance department; his job was not simply to execute but to initiate.[5] Plaintiff did not conduct the weekly meetings specified in the function job description until January. Davis had relayed to Nedd concerns from the compliance department about Plaintiff's supervision of that department. He also relayed to Nedd that, as early as the orientation, Plaintiff was observed using his phone for personal business, contrary to his responsibility to model positive behavior. Nedd testified that she also observed Plaintiff on the computer and occasionally on the phone and that she had had a conversation that he needed to limit his personal use of the phone. *Id.* at 389. Other employees did not observe Plaintiff making personal calls. Nedd observed that Plaintiff frequently was not staying until close of business at 5:30 p.m. and that she mentioned her dissatisfaction to Plaintiff. *Id.* at 423. Finally, Plaintiff was absent for a critical time during the TJC mock survey and Nedd had to step in to perform a function assigned to Plaintiff. Davis also observed Nedd ask, at least twice, about the whereabouts of Plaintiff and then ultimately perform his function. *Id.* at 516-17. As a result, Nedd came to believe that she could not rely on Plaintiff.

In the end, the Court need not judge whether Plaintiff was a good employee. While the Court "must ensure that employers do not act in a discriminatory fashion," it does "not sit as a

---

[5] Defendants also disputed that Plaintiff was ever asked to terminate the employment of Rico. Trial Tr. at 395.

super-personnel department that reexamines an entity's business decisions." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997)); *see Stewart v. Fashion Inst. of Tech.*, 2020 WL 6712267, at *9 (S.D.N.Y. Nov. 16, 2020) ("An employer can subject an employee to harsh and—in the minds of the recipient—unfounded criticism without subjecting itself to a discrimination lawsuit."); *Williams v. N.Y.C. Dep't of Sanitation*, 2001 WL 1154627, at *18 (S.D.N.Y. Sept. 28, 2001) ("[A c]ourt may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom.") (collecting cases). The factual question for the Court is whether Nedd's concerns were genuine (regardless of whether they were mistaken), or whether they were false and a pretext for discrimination. Plaintiff may have been well-liked by those whom he supervised. But Plaintiff has not shown that Nedd's concerns were pretextual. *See, e.g.*, *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008), *aff'd*, 360 F. App'x 214 (2d Cir. 2010) ("[I]t is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.").

The concerns expressed by Nedd on March 7, 2019, which formed the basis for Plaintiff's termination, echo those that were expressed throughout Plaintiff's employment and were based in part on what Nedd observed and in part on what she was told; they were not invented at the last minute to justify Plaintiff's termination. Concerns about Plaintiff's phone usage and particularly the behavior he was modelling arose as early as the orientation in November 2018. The Court found credible the testimony that Plaintiff had to be instructed not to use his phone and disregarded that instruction, that such behavior was concerning for a person

who was in a human resources role, and that the behavior was reported to Nedd.  Plaintiff need

not have been instructed by Nedd on that particular incident or disciplined immediately for it to

have later formed part of the basis for Nedd's decision to terminate his employment.  Nedd also

had expressed concerns about Plaintiff's management abilities and leadership skills as early as

January 2019.  That was the basis for her decisions to move his workspace closer to the

compliance department and to relieve him of the responsibility to supervise the human resources

business partners.  Although Plaintiff claims he never had a meeting where he was told

specifically that he did not meet expectations and needed improvement, it is undisputed that

when Nedd met with Plaintiff in January 2019 to tell him that his desk was being moved, she

also told him that it was being moved because he had failed to maintain sufficient contact and

establish a relationship with the compliance department.  The Court also finds credible the

testimony that Nedd believed that Plaintiff was not sufficiently responsible during the TJC mock

survey and that from his behavior on that day, she could no longer rely upon him to manage

some of the most critical responsibilities of the assistant personnel director on his own.  Whether

the concern was justified or not, the Court finds that it was genuine and heartfelt.

The parties also dispute whether the timing and procedure for the performance evaluation

complied with Harlem Hospital's rules.  Plaintiff points to the Harlem Hospital Procedure

Manual with respect to performance evaluations (the "Manual").  *See* PX10.  The Manual

provides that newly hired or promoted managerial employees within Group 11 (Plaintiff's group)

would be evaluated after six months.  PX10 at HHC_0161.  It also provides that "[e]mployees

rated less than satisfactory will have a plan of correction outlined, and be re-evaluated within

three months."  *Id.* at HHC_0160.  The instructions for managers in the performance evaluation

provide that the employer will review the self-evaluation and meet with the employee before

entering the performance evaluation through PeopleSoft and that "[i]f the Overall Summary rating is 'Needs Improvement,' the supervisor must create a Collaborative Achievement Plan (CAP), and discuss it with the employee during the evaluation."  PX3.  The Manual once again provides: "Employees rated as Needs Improvement (NI) must be reevaluated after three months" and "[i]f their performance does not improve to Fully Competent (c) or above, these employees are to be reassigned or terminated at the end of the reevaluation period."  PX10 at HHC_0171. The Manual also states that prior to a managerial performance appraisal, there would be an "initial planning meeting" to set forth the manager's performance goals, and subsequent progress reviews to assess that performance prior to the written evaluation.  *Id.* at HHC_0167-71.  Finally, the Manual provides that an employee is entitled to rebut any negative ratings, and sets forth a process and requisite forms for doing so.  *See* PX10 at HHC_0163, HHC_0173; PX3.

Those procedures were not followed in Plaintiff's case.  There was no initial planning meeting and he was not given a collaborative action plan or any corrective plan.  He was not given a chance to rebut the negative ratings, and he was terminated immediately and not given an opportunity for re-evaluation after three months.

Defendants maintain, however, that as a new employee who was at-will, Plaintiff was not entitled to the benefit of those provisions.  Defendants rely on language from the Manual that states that with respect to employees in managerial Group 11, such as Plaintiff, the "Rating Period may be modified or shortened with consultation from the Department of Human Resources Director."  PX10 at HHC_0161.  The human resources director was Nedd.  Nedd also testified that the process changed in the spring of 2019 so that non-union managerial employees of Group 11 who are new hires were evaluated after three months; her testimony was corroborated by Rico, one of the witnesses called by Plaintiff.  Trial Tr. at 369.  Because Plaintiff

had not completed three months of employment and was still in his "probationary" period, management was responsible for evaluating his employment against the job requirements and had the ability to terminate him.  The requirement for a collaborative action plan and for a follow-up is only for employees whom Harlem Hospital decides to retain.  It does not prevent Harlem Hospital from terminating the employment of an individual who, based on the first three months of employment, it has determined will not satisfy the requirements of the job and whom it decides not to retain.[6]

Plaintiff has not shown that receiving a performance evaluation after three months violated Harlem Hospital's policies and procedures.[7]  Two employees, including Plaintiff's witness Rico, testified that it was Harlem Hospital's procedure to evaluate new employees against the job requirements after three months on the job.  The Manual does not set forth a hard-and-fast deadline prohibiting Harlem Hospital from doing so.  Although it states that "[n]ewly hired or promoted managerial employees shall be appraised after six months," it adds that the "Rating Period may be modified or shortened with consultation from the Department of

---

[6] There is conflicting testimony as to when Plaintiff received the self-evaluation.  He testified that he first received it only the day before he was terminated.  Defendants testified that the documentary evidence reflects he received it at the end of December 2018.  *See* PX3.

[7] A violation of these procedures, even if Plaintiff had shown one, would not be sufficient to lead to a conclusion of pretext on the facts here.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) (although "[d]epartures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision," "[i]n this case, however, whatever irregularities existed did not affect the final decision to deny [plaintiff] tenure" because the irregularities had "no effect on any committee member's assessment of [plaintiff]'s candidacy for tenure" and there was "no evidence that [plaintiff]'s sex played a role in any alleged procedural irregularities").  There was no evidence that would suggest that anything Plaintiff could have said in response to the negative ratings would have changed Defendants' assessment that Plaintiff "seemed more comfortable doing tasks than actually managing people or process," Trial Tr. at 476, that "he was hired to be a leader not a front line worker . . . but that's not what [defendants] needed and what [they] hired him for," *id.* at 422, and that rather than giving him the opportunity for a collaborative action plan, his employment should be terminated.

Human Resources Director." PX10 at HHC_0161. That notion—that the review need not wait until after the employee has been on the job for six months—is supported by the language in the Manual regarding the "Initial Competency assessment." *Id.* at HHC_0160. It provides, in relevant part, "Initial Competency assessment shall be completed . . . *within* six months of hire and/or transfer into the department, introduction of new equipment, program and/or procedure (Group 11 Managers)," and that "[c]ompetencies are assessed according to specific job requirements at least annually or as necessary before or during departmental and job specific orientation, change in assignment/responsibilities or due to the introduction of new equipment, program and/or procedure." *Id.* at HHC_0161. The notion appears to be that the six months sets a presumptive outer limit for the review of a new employee. Nor do the procedures, fairly read, require Harlem Hospital to retain an employee who it determines is not meeting the requirements of the job. The Manual states: "Disciplinary action is to be taken when an employee fails to achieve satisfactory performance." *Id.* at HHC_0160. The only limitation is that "[s]uch disciplinary action must be taken in accordance with the applicable rules, regulations, and collective bargaining agreements." *Id.* There is no requirement that it be taken only after a collaborative action plan is agreed and the employee fails to satisfy it.

### H.    Post-Termination

The termination of Plaintiff's employment plainly had a negative impact on him. He has not been able to find employment since he was terminated from Harlem Hospital. He has applied for jobs in human resources at over 300 companies without success. He testified that his depression and anxiety—both with which he was previously diagnosed before beginning employment at Harlem Hospital—have worsened and his antidepressant dosage has increased to the highest dosage. *See, e.g.*, Trial Tr. at 145. He has been unable to obtain mental health counseling with Medicaid and has been placed on a wait list. *Id.* at 144. He is on public

assistance and food stamps.  He has gained weight and experienced irregular sleep.  Based on his testimony and that of his sister, he was once a "happy" person who had a social life but is now unhappy and unable to afford to have a social life.  *Id.* at 143-46.

As a result of his inability to find employment in the New York area, Plaintiff now plans to leave New York to find employment elsewhere and in a different field.  Specifically, he intends to return to his home state of Florida and to obtain employment teaching elementary school where an entry level position for a person with a Master's degree would pay approximately $56,000 a year.  *Id.* at 151-52.

Plaintiff claims that as a result of his termination, he lost his income of $85,000 per year. He has had to seek public assistance, returning to the HASA program, which, inter alia, subsidizes his rent and utilities and provides a monthly cash allowance.  *See* Dkt. No. 94 at 8 ¶ 37.  Plaintiff will therefore be required to repay to the NYC Human Rights Administration up to $50,000 or more from any recovery he receives in this case.  *Id.*

## II.    <u>CONCLUSIONS OF LAW</u>

Plaintiff asserts discrimination and retaliation claims pursuant to Title I of the Americans with Disabilities Act ("ADA"), and discrimination claims under New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").[8]  Each of those claims is subject to the burden-shifting framework set forth at *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74-75 (2d Cir. 2016) (applying the *McDonnell Douglas* framework to NYSHRL claim); *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (ADA claim); *Emengo v. Stark*, 774 F. App'x 26, 29 (2d Cir. 2019) (NYCHRL claim).  However, the NYCHRL claim should be analyzed

---

[8] The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367.

"separately and independent from any federal and state law claims" and construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Green v. Mount Sinai Health Sys., Inc.*, 826 F. App'x 124, 125 (2d Cir. 2020) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).

To establish a prima facie case for discrimination under the ADA and NYSHRL, "a plaintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *McMillan*, 711 F.3d at 125 (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).

Under the NYCHRL, the elements are almost exactly the same, except a plaintiff need only be treated "less well" in connection with his or her disability to establish liability. *See Johnson v. Strive E. Harlem Emp. Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (citing *Mihalik*, 715 F.3d at 110); *see also Wells v. Achievement Network*, 2021 WL 810220, at *11 (S.D.N.Y. Mar. 2, 2021) ("[C]ourts in the Second Circuit typically 'appl[y] [the] liberal standards [of the NYCHRL] to the basic *McDonnell Douglas* framework.'") (quoting *Alexander v. N.Y.C. Dep't of Educ.*, 2020 WL 7027509, at *3 (S.D.N.Y. Nov. 30, 2020)). "Even so, 'the broader purposes of the City HRL do not connote an intention that the law operate as a general civility code.'" *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 689 (S.D.N.Y. 2011) (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 40 (1st Dep't 2009)). "Accordingly, defendants in NYCHRL suits have an affirmative defense 'if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences.'" *Id.* at 689 (quoting *Williams*, 872

N.Y.S.2d at 41).  This defense "target[s] concerns about truly insubstantial cases, while at the same time avoiding improperly giving license to the broad range of conduct that falls between 'severe or pervasive' on the one hand and a 'petty slight or trivial inconvenience' on the other." *Id.* (quoting *Williams*, 872 N.Y.S.2d at 41).

To establish a prima facie case for retaliation under the ADA and NYSHRL, a plaintiff must show that "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists  between the alleged adverse action and the protected activity."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006).  Temporal proximity is sufficient to establish the inference of retaliation and the causal connection necessary between an employee's protected activity and the employer's adverse action.  *See Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("[T]he but-for causation standard does not alter the plaintiff's ability to demonstrate causation . . . at trial indirectly through temporal proximity."); *see also Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001) (prima facie case of discriminatory retaliation established where 14 months elapsed between filing of EEOC complaint and termination); *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 319 (S.D.N.Y. 2002) (six-month period between filing of EEOC complaint and termination of two plaintiffs sufficient to infer causal connection); *Vernon v. Port Auth. of N.Y. and N.J.*, 154 F. Supp. 2d 844, 859 (S.D.N.Y. 2001) (four-month period between start of internal EEO investigation and plaintiff's performance downgrade sufficient to establish causal nexus).  Thus, a plaintiff "may establish a causal connection either directly, through proof of retaliatory animus, or indirectly, through circumstantial evidence that, for example, the adverse action followed close on the heels of the protected activity, or that the employer also took adverse action against other employees who

engaged in protected conduct." *Sulehria v. City of New York*, 670 F. Supp. 2d 288, 307 (S.D.N.Y. 2009).

The parties agree that as a person living with HIV, Plaintiff is a member of a protected class and has a disability for the purposes of the ADA, NYSHRL, and NYCHRL. *See, e.g.*, *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998) ("HIV infection is a disability under the [ADA].") (citing *Bragdon v. Abbott*, 524 U.S. 624, 639-45 (1998)); *Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 341 n.51 (S.D.N.Y. 2010) ("The NY[S]HRL's definition of 'disability' is broader than that in the ADA."); N.Y.C. Admin. Code § 8-102(16)(a) (defining disability as physical impairment, including impairment to the immunological systems").

Plaintiff, however, has not shown that Defendants were aware of his disability before he was terminated from his employment. "[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020). Although Plaintiff testified that he informed Nedd of his disability and requested an accommodation, the weight of the evidence does not support that conclusion. Nedd denied that such a conversation occurred and her testimony was supported by the documentary evidence. The evidence offered by Plaintiff was, for the most part, either self-serving or not disinterested, or, in the case of the writing, could not be verified. In the face of Defendants' contrary evidence, the Court has found that Plaintiff failed to show that he informed Nedd or anyone else at Harlem Hospital of his disability or that he requested an accommodation. *See id.* at 82 (affirming dismissal where "Plaintiff failed to plausibly allege that Defendants knew or should reasonably have known he was disabled"); *see also Jones v. N.Y.C. Transit Auth.*, 838 F. App'x 642, 644 (2d Cir. 2021) (affirming dismissal where no evidence that employer had notice of disability requiring reasonable accommodation); *Frantti v.*

*New York*, 2021 WL 864706, at *2 (2d Cir. Mar. 9, 2021) (plaintiff's email sent to human resources asking "to explore the possibility of a modified work schedule" was insufficient notice and plaintiff "identifie[d] nothing in the record showing that he followed up after Human Resources directed him to online information about New York's policies and provided him with a copy of the application).

Even if Plaintiff had shown that Defendants were aware of his disability, the evidence does not support that Defendants took adverse employment action against him because of his disability. Plaintiff claims discrimination against Nedd only; he had not identified any other individuals whom he believes discriminated against him. Plaintiff alleges several different types of adverse employment actions in support of his discrimination and retaliation claims that he alleges he suffered as a result of his disability: (1) the human resources business partners would no longer report to him and were told to report instead directly to Nedd; (2) Defendants removed him from his office and relocated him to an open workspace near the compliance department; and (3) Defendants "bann[ed] him from the employee restrooms on the floor where he worked." Dkt No. 94 at 11 ¶ 11(a). He also alleges that the failure to accommodate his disability also constitutes discrimination. Finally, he contends that his employment was terminated as a result of his disability. The Court considers each in turn.

"[R]eassignment of job duties is not automatically actionable." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006). Rather, the question of "whether a reassignment of job duties 'is materially adverse depends upon the circumstances of the particular case.'" *Lewis v. N.Y.C. Transit Auth.*, 12 F. Supp. 3d 418, 450 (E.D.N.Y. 2014) (quoting *Burlington N.*, 548 U.S. at 71). "Changes in assignments or responsibilities that do not 'radically change' the nature of work are not typically adverse employment actions." *Potash v. Fla. Union Free Sch. Dist.*,

972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013); *see Burlington N.*, 548 U.S. at 71 (change in assignment was adverse employment action where plaintiff's new duties were "more arduous and dirtier" and the old job had "required more qualifications, which is an indication of prestige" and had been "objectively considered a better job").

There is no evidence here that the change in reporting structure "had a material effect on [Plaintiff's] job or standing," and his pay was not reduced. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 26 n.11 (2d Cir. 2014). Plaintiff testified that he had not yet started his duties as the direct supervisor to the human resource business partners, Davis and Grimes-Davis, so that "[t]here is no evidence that Plaintiff's tasks and assignments had any actual material, as opposed to a speculative, impact on [his] job." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 214 (E.D.N.Y. 2014); *see* Trial Tr. at 54 ("I had not had an opportunity to even meet with the team and begin to formally start managing them."). And although Plaintiff felt that the change in reporting was "not a fair decision," he testified that he did not challenge it and in fact "accepted it." Trial Tr. at 54.

The relocation of Plaintiff's workspace from outside Nedd's office to the compliance department was not an adverse employment action. *See Price*, 808 F. Supp. 2d at 690. It involved the movement of Plaintiff from a desk in an office suite at one end of a hall to a location approximately 25-30 feet away. Both before and after the move Plaintiff was seated in an open area; it was not akin to movement from an executive C-suite office to a cubicle. Plaintiff also does not present evidence that the relocation was inconvenient, denoted a demotion in job responsibilities, or otherwise had any effect on the terms and conditions of his employment. *See, e.g.*, *Rasco v. BT Radianz*, 2009 WL 690986, at *15 (S.D.N.Y. Mar. 17, 2009) (dismissing claim where plaintiffs had "not shown that their relocation impaired their

performance or reduced their sales opportunities or commissions"). The move placed Plaintiff closer to the team whom he was supervising and with whom he would have to interact, and the person who previously held Plaintiff's job also sat with the compliance department. *See E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 872 (S.D.N.Y. 2013) (finding that plaintiff "has not demonstrated that the movement of her desk amounts to an adverse employment action because she has not offered any evidence indicating how this affected the terms of her employment since she was still placed with her team as a general matter"); *see also Cunningham v. N.Y. State Dep't of Lab.*, 2010 WL 1781465, at *6 (N.D.N.Y. Apr. 30, 2010) (characterizing relocation of an office from the fifth to the first floor as a "trivial harm").

Plaintiff has not proven that Nedd took an adverse employment action against him by virtue of her instruction regarding the use of the bathroom. The Court finds that Nedd instructed Plaintiff not to use the bathroom in the suite that they were then sharing and suggested that he use the bathroom on the fourth floor because it was a public floor that would be cleaned more regularly. Plaintiff has not shown that Nedd prohibited him from using the other bathrooms on the sixth floor or required him to notify others if he left the sixth floor to use the bathroom. Plaintiff requested and was given the code to the other private bathroom on the sixth floor. He was observed using other bathrooms on the sixth floor. No other witness supported his testimony that he was required to report when he left the floor to use the bathroom or that he, in fact, did so. The only evidence that he was required to leave the floor to use the bathroom was Plaintiff's own testimony which, in the absence of any corroboration and in the face of the contrary evidence, the Court finds to be insufficient to establish that he did receive that instruction. The Court finds that the weight of the evidence supports that Plaintiff was permitted to use the bathrooms on the sixth floor and that he did so.

A direction to an employee that he leave his location of employment and report to others when he needs to use the bathroom could, under the facts and circumstances, constitute an adverse employment action. As Plaintiff testified, an instruction to inform others of the need to relieve oneself is "embarrassing. We're adults in the workplace. This isn't kindergarten where you tell people where you are going." Trial Tr. at 77. But the Court does not find that Plaintiff was given such an instruction. The request he did receive, from Nedd that Plaintiff not use her private bathroom, did not alter the terms and conditions of Plaintiff's employment. *Cf.* *Zhengfang Liang v. Cafe Spice SB, Inc.*, 911 F. Supp. 2d 184, 209 (E.D.N.Y. 2012) ("Given that plaintiff had alternatives to using the unisex bathroom, the issues plaintiff raises regarding her experiences while using the unisex bathroom are not sufficiently severe or pervasive enough to support a hostile work environment claim."); *Raeburn v. Dep't of Hous. Pres. & Dev. of the City of New York*, 2015 WL 4016743, at *14 (E.D.N.Y. June 24, 2015) (dismissing hostile work environment claim based on the lack of a female locker room because plaintiff "does not allege that she and the other women had no place to change or that the lack of a locker room affected her ability to perform her job"). That Plaintiff may have preferred the bathroom in Nedd's office suite does not establish an adverse employment action. *See, e.g.*, *Gasperini v. Dominion Energy New Eng., Inc.*, 2012 WL 2402804, at *11 (D. Mass. June 25, 2012) (plaintiff's "discomfort with the facilities, without more, does not constitute an adverse employment action"); *Macklin v. Am. Sugar Refin., Inc.*, 2007 WL 2815984, at *1 (D. Md. Sept. 26, 2007) (plaintiff's claim that she "does not like to use that bathroom because she believes it to be 'substandard and unclean' . . . does not establish disparate treatment").

Nor does the evidence indicate that Nedd failed to provide a reasonable accommodation. "A reasonable accommodation is one that 'enable[s] an individual with a disability who is

qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment.'"  *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting 29 C.F.R. § 1630.2(o)(1)).  Assuming Plaintiff did in fact ask Nedd for a reasonable accommodation, his testimony was that he asked only for "easy access to the bathroom."  Trial Tr. at 23.  Nedd's later request not to use the bathroom in her suite did not prevent Plaintiff from using the other bathrooms on the same floor, from having "easy access to the bathroom," or from otherwise performing his job.  Additionally, Plaintiff testified that he was still able to change his shirt in a bathroom and could still put his head down on his desk if he became dizzy.  "[I]n a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability . . . the plain reasonableness of the existing accommodation ends the analysis."  *Id.*

The termination of Plaintiff's employment, however, is an adverse employment action. *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) ("Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.") (citation and internal quotation marks omitted).  The burden thus falls to Defendants to provide some legitimate, non-discriminatory reason for its action.  *See McDonnell Douglas*, 411 U.S. at 802. If the Defendants do so, Plaintiff can no longer rely on the presumption of discrimination raised by the prima facie case but rather must prove that Defendants were motivated to take their action by reason of Plaintiff's disability.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).  "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff

remains at all times with the plaintiff.'"  *Holcomb*, 521 F.3d at 138 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

However, although a combination of Defendants' knowledge of Plaintiff's HIV-positive status combined with the request that he use a different bathroom and sit in a different location might lead to an inference of discriminatory intent sufficient to make out a prima facie case, *see Deer Mountain Day Camp*, 682 F. Supp. 2d at 324, the Court finds, as an alternative basis for its decision, that Defendants proved that they had a legitimate, non-discriminatory reason for Plaintiff's termination and Plaintiff has not proved that the proffered reason was a pretext for discrimination.  *See McBride v. BIC Consumer Prods. Mfg. Co. Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (citing *Sista*, 445 F.3d at 169).

Nedd's decision to terminate Plaintiff's employment was based on her ultimate determination that she could not rely on him.  She had hired Plaintiff to be her deputy because she needed someone to help her manage the department and to be able to manage the human resources department in her absence.  She also wanted someone to help build the human resources business partner framework and manage a team of business partners.  Those objectives were reflected in Plaintiff's "Functional Job Description."  In Defendants' judgment, Plaintiff failed to discharge the responsibilities to the extent required by that description and could not be relied upon to discharge them in the future.  Defendants terminated Plaintiff because he failed to establish himself as a human resources liaison, because he had failed to provide the human resource business partner tool that had been discussed, because he had not made process change recommendations, because he had failed to exercise leadership and appropriate role modeling, and because he could not be relied upon in some of the most important functions he had been assigned.  *See supra*.  Plaintiff proffered evidence that he performed his job well and was well-

liked by subordinates.  But in an employment discrimination case, the question is not whether the

Plaintiff in fact performed his job well.  The Court makes no judgment in that respect.  That

question is entrusted to management who makes the adverse employment decision and for future

employers who might consider retaining Plaintiff.  That question for the Court is whether the

stated bases for the adverse employment action were the true bases and whether those stated

bases were legitimate.  *See, e.g.*, *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 260-61

(S.D.N.Y. 2009).  The Court so finds here.

 Finally, even if the proffered reason for Plaintiff's termination were pretextual, the Court

would find that Plaintiff has not satisfied his "ultimate" burden to show that Defendants

intentionally discriminated against him on the basis of his disability.  *See Reeves*, 530 U.S. at

146-47 ("[T]he ultimate question is whether the employer intentionally discriminated, and proof

that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not

necessarily establish that the plaintiff's proffered reason . . . is correct.'") (quoting *St. Mary's*

*Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)).  There is no evidence that Nedd or anyone else

at Harlem Hospital made derogatory comments about Plaintiff or that she or anyone else made

comments about his HIV status.  Both Nedd and Davis testified credibly that they did not know

about his HIV-positive status.

 There also is no evidence that Plaintiff was treated worse than others who were not

similarly situated.  Although Plaintiff complains that after Nedd's January 2019 decision he was

not able to use the bathroom in her suite and that in January 2019 he was moved closer to the

compliance department, the evidence is undisputed that even before that date and at all relevant

times, no one other than Nedd was able to use the bathroom in her suite and that the prior

employee who held Plaintiff's job position was also seated next to the compliance department.

Accepting Plaintiff's account, he told Nedd of his disability in December 2018 but also accepting that account, he was given responsibility for the relationship with the human resources business partners and supervising the compliance department after that date.  Thus, even assuming that there were some difficult interpersonal relations between Nedd and Plaintiff, and even assuming those difficult interpersonal relations contributed to Nedd's decision not to give Plaintiff a further opportunity to prove himself, that evidence would not rise to the level of intentional discrimination.  For the foregoing reasons, Plaintiff has failed to make out a case under the ADA, NYSHRL, or the more liberal NYCHRL.

Plaintiff also has not made out a claim of retaliation under the ADA or state and city law claims.  It is illegal under the ADA for an employer to take adverse action against an employee because of the employee's request for a reasonable accommodation.  Plaintiff claims he engaged in protected activity when he allegedly made a verbal request for a reasonable accommodation from Nedd on December 13, 2018.   A request for an accommodation is protected activity.  *See, e.g.*, *Rodriguez v. Altria Sr. Grp., Inc.*, 887 F. Supp. 2d 503 (S.D.N.Y. 2012).  The request for an accommodation need not be in writing or follow any specific format to constitute a request for a reasonable accommodation.  The ADA "is not concerned about 'formalisms about the manner of the request, but whether the employee . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation."  *Dipinto v. Westchester Cnty.*, 2020 WL 6135902, at *6 (S.D.N.Y. Oct. 19, 2020); *see Phillips v. City of New York*, 884 N.Y.S.2d 369, 382 & n.24 (1st Dep't 2009) ("A request for accommodation need not take a specific form," so the "requests for accommodation may be in plain English, need not mention the statute or the term reasonable accommodation, and need not be in writing.").

However, in order to prove a claim of retaliation on the basis of the request for a reasonable accommodation, the plaintiff needs to have made the request and the person taking the action needs to have known of the request.  *See, e.g.*, *Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 18 (2d Cir. 2017) (no inference of retaliation where plaintiff failed to make a request for accommodation); *Weixel v. Board of Educ. of City of N.Y.*, 287 F.3d 138, 149-50 (2d Cir. 2002) (for a retaliation claim based on a failure to accommodate, defendants must be "aware of plaintiffs' attempts to seek such accommodations").  As discussed *supra*, the evidence at trial failed to establish that Defendants knew of Plaintiff's request for an accommodation at the time they took any of the actions alleged to be retaliatory in this case.  Plaintiff admits that the only form his request for an accommodation took was the supposed oral conversation with Nedd on December 13, 2018.  Plaintiff did not make any written request for an accommodation; nor did he make any other oral request other than in the December 13, 2018 conversation with Nedd.  Plaintiff failed to prove, however, that he had a conversation with Nedd on December 13, 2018 or otherwise in which he requested an accommodation.  The weight of the evidence supports Nedd's testimony that Plaintiff first told her of his disability and his need for an accommodation in March 2019, after she told him that his employment was terminated effective immediately and while he was threatening her with suit.  Defendants thus could not have taken a retaliatory action against him because of his request for a reasonable accommodation.

Plaintiff's retaliation claim under the NYCHRL fails as well.  The elements of a retaliation claim are the same under the ADA, NYSHRL, and NYCHRL.  *See Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 798 (S.D.N.Y. 2020).  To prevail on a retaliation claim under the NYCHRL, a plaintiff must all allege that she "took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely

to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112. "[R]ather than just protecting plaintiffs who engage in protected activities from adverse employment actions, the NYCHRL more broadly protects plaintiffs who 'oppos[e] any practice forbidden under' the law from employer conduct that is 'reasonably likely to deter a person engaging in such action.'" *Sivio*, 436 F. Supp. 3d at 800 (quoting *Mihalik*, 715 F.3d at 112); *see also* N.Y.C. Admin. Code § 8-107(7) ("It shall be an unlawful discriminatory practice" for an employer to engage in acts "reasonably likely to deter a person from" opposing "any practice forbidden" under the law). As discussed *supra*, the evidence demonstrates that Plaintiff's termination "arose from [Defendants]' perception that [Plaintiff] could not perform the essential functions of [his] job" and not as retaliation in response to Plaintiff's purported request for an accommodation. *Sivio*, 436 F. Supp. 3d at 802. Thus, even after conducting an "independent liberal construction analysis" under the NYCHRL that is "targeted to understanding and fulfilling what the statute characterizes as [its] 'uniquely broad and remedial purposes,'" the Court still finds that Plaintiff has failed to prove his retaliation claim. *Williams*, 872 N.Y.S.2d at 66.

## CONCLUSION

For the reasons explained above, the Court finds that Defendants are not liable on Plaintiff's claims for violations of the ADA, NYSHRL, and NYCHRL. It is hereby ORDERED, that judgment is entered in favor of Defendants and against Plaintiff. The Clerk of Court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

Dated: July 1, 2021
     New York, New York
                             LEWIS J. LIMAN
                     United States District Judge